USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/21/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MATTHEW JONES,

                    Plaintiff,                    16-cv-8080 (JGK)

         – against –                              OPINION AND ORDER

POLICE OFFICER ADAM MUNIZ ET AL.,

                    Defendants.

JOHN G. KOELTL, District Judge:

A jury found the defendant,[1] Christopher Treubig, a Lieutenant[2] with the New York City Police Department, liable for using excessive force against the plaintiff, Matthew Jones, in violation of the Fourth and Fourteenth Amendments. The defendant used a taser twice, for a total of ten seconds, against the plaintiff in the course of arresting the plaintiff. While the jury found that the plaintiff suffered no compensatory damages, it awarded punitive damages against the defendant. The defendant now moves under Federal Rule of Civil Procedure 50 for judgment as a matter of law on qualified immunity grounds. For the reasons below, the defendant's motion is **granted**.

---

[1] In addition to Lieutenant Treubig, the plaintiff sued New York City Police Department Officers Adam Muniz and Michael Vaccaro, and New York City Police Department Undercover Officer No. 349. The jury found that these additional defendants were not liable to the plaintiff. The plaintiff's claims against those defendants are not at issue in this motion. Therefore, references to "the defendant" refer only to Lt. Treubig.

[2] At the time of the incident at issue, the defendant was a sergeant. He is now a lieutenant. Tr. 172, 238.

1

I.

A.

The plaintiff brought this action under 42 U.S.C. § 1983 alleging that Lt. Treubig and other officers deprived him of his right under the Fourth and Fourteenth Amendments to be free from excessive force. The case was tried to a jury from May 21, 2018, to May 24, 2018. The jury found Lt. Treubig liable to the plaintiff for having used excessive force. The jury awarded nominal damages of $0.25, no compensatory damages, and punitive damages of $30,000. The following facts are established by the trial record and are consistent with the jury verdict.

On April 7, 2015, Officers Vaccaro and Muniz conducted a vertical patrol[3] of a building known as the AK Houses, which is located at 112 East 128th Street in New York City. Tr. 205. The officers understood the building to be a "drug prone location." Tr. 159. The officers heard the plaintiff and another individual speaking in a stairwell on the seventh floor. When the officers approached the plaintiff, Officer Muniz saw that the plaintiff was holding a sum of money and a pill bottle. Tr. 181. The officers suspected that the individuals were engaged in a drug transaction. Tr. 134, 182.

---

[3] A vertical patrol is a floor-to-floor check of a building's stairwells and hallways. The purpose of a vertical patrol is to prevent crime and ensure safety in the building. Tr. 158.

The officers moved the individuals into a narrow hallway and Officer Vaccaro frisked the plaintiff. During the frisk, Officer Vaccaro recovered a bottle of Oxycodone from the plaintiff. Tr. 161, 185. Officer Vaccaro then attempted to place the plaintiff under arrest. Tr. 162. The other individual fled into the stairwell. Tr. 140, 210.

When Officer Vaccaro told the plaintiff that the plaintiff was under arrest, Officer Vaccaro was able to handcuff only the plaintiff's right wrist. Tr. 135. The plaintiff refused to give up his left arm. At that point, the plaintiff and the officers got into a physical altercation. Tr. 135. The plaintiff testified that he is not sure how it happened, but that both the plaintiff and Officer Vaccaro "ended up on the floor," and Officer Muniz also fell to the ground. Tr. 53-55, 211. Once on the floor, the plaintiff tucked both arms under his body, which made his arms inaccessible to the officers. Tr. 228. The officers repeatedly told the plaintiff to give them his left arm. The plaintiff resisted the officer's efforts and was able to keep his left arm tucked under his body. Tr. 55-56, 211. Officer Muniz then used his asp[4] in an unsuccessful attempt to lever the plaintiff's left arm out from under the plaintiff's body. Tr. 196, 214-15.

---

[4] An asp is an expandable metal baton. Tr. 212.

Officer Vaccaro then radioed for backup. Tr. 141. Undercover Officer 349 and her partner arrived first. The officers used their asps and pepper spray in further attempts to gain control of the plaintiff's left arm.[5] The officers repeatedly told the plaintiff to "stop resisting" arrest. Tr. 147. Despite the officers' use of asps and pepper spray, the plaintiff was able to keep his left arm tucked underneath his body. Tr. 232-33.

The defendant, Lt. Treubig, and his partner arrived on the scene while the other officers continued to struggle to handcuff the plaintiff. Tr. 148, 197. The defendant could see that the plaintiff was resisting arrest, and that in addition to telling the plaintiff to give up his arm, the other officers were using various tactics to handcuff the plaintiff. Tr. 258. The defendant could also see that the plaintiff was a very large person,[6] and that the other officers were likely exhausted from their attempts to handcuff the plaintiff. Tr. 259.

The defendant instructed the plaintiff to put his arms behind his back. The plaintiff did not comply with the defendant's instruction. Tr. 149-50. Because of his observations of the plaintiff's resistance to arrest and the struggle between

---

[5] The jury ultimately found that the officers' use of their asps and pepper spray did not constitute excessive force in violation of the Fourth and Fourteenth Amendments.

[6] The plaintiff is 5'8" tall and weighed 250 pounds on the date of his arrest. Tr. 47-48.

4

the plaintiff and the other officers, the defendant believed that it would be reasonable to use a taser. Tr. 259, 276-277. The defendant warned the plaintiff that if the plaintiff did not give the officers his arm, the defendant would discharge his taser. Tr. 198, 234, 259. The plaintiff continued to resist arrest and responded by stating, "I'm not going to jail." Tr. 145, 198, 259. The defendant then deployed his taser, hitting the plaintiff in the back. Tr. 201.

The parties agree that despite being tased, the plaintiff was not incapacitated. The taser did not stabilize the plaintiff enough for the officers to be able to grab his hands. Tr. 262. The plaintiff continued to try to pull his right arm away from the officers and under his body after the first taser cycle. Tr. 154. The plaintiff maintained control of his arms and began pushing himself off the ground. The defendant reassessed the situation and believed that the plaintiff was still resisting arrest. Tr. 262. The defendant then recycled the taser.[7] Tr. 154. The defendant believed that it was necessary to recycle the taser to get the plaintiff into handcuffs. Tr. 262. Each taser cycle lasted for five seconds, and the time between the first and second taser cycles unfolded so rapidly that it was not

---

[7] The defendant deployed the taser in cartridge mode -- that is, the taser deployed barbs into the plaintiff's back. As a result, the defendant did not "deploy" the taser a second time. Rather, the defendant "recycled" the taser, because the barbs were already in the plaintiff's back. See Tr. 262, 280.

5

clear to everyone on the scene that the plaintiff had been tased twice.[8] Tr. 262.

After the second taser cycle, the officers were able to complete handcuffing the plaintiff. Tr. 172-73, 202, 263. Because of the plaintiff's large size, the officers had to use two pairs of handcuffs to handcuff the plaintiff. Tr. 173. Lt. Treubig called an ambulance to take the plaintiff to a hospital to have the taser's metal probes removed from the plaintiff's back. Tr. 218, 277. The plaintiff walked down the stairs to the ambulance. Tr. 218.

The time that elapsed from Officer Vaccaro's request for backup until the defendant called for an ambulance was only three minutes. Tr. 278.

B.

At the close of evidence at trial, the defendants moved for judgment as a matter of law on qualified immunity grounds. The Court reserved decision on the defendants' motion and submitted the case to the jury. The jury returned its verdict on May 23, 2018, finding that the plaintiff had not proved his excessive force claims against any defendant other than Lt. Treubig. The

---

[8] See Tr. 201-02 (testimony of Officer Muniz that "[he] only perceived [the tasing] as once"); 236 (testimony of Undercover Officer 349, stating that she did not know how many times the plaintiff was hit with the taser); Tr. 59 (testimony of the plaintiff stating that although it felt like he was tased twice, he was not sure).

jury awarded nominal damages of $0.25 and punitive damages of $30,000.[9] The jury did not award any compensatory damages.

Following the jury verdict, the parties sought to clarify the factual record in order for the Court to determine as a matter of law whether Lt. Treubig is entitled to qualified immunity. Tr. 419-28. The parties stipulated that Lt. Treubig did not use any force other than his use of the taser against the plaintiff and that the plaintiff was pushing off the ground at the time Lt. Treubig used the taser. Tr. 421-22. The defendants then requested that a series of questions be posed to the jury to resolve factual issues regarding Lt. Treubig's use of the taser against the plaintiff. On May 24, 2018, the jury answered a series of special interrogatories as follows:

> 1. Did Lieutenant Treubig say he would use the taser before he used it? A: Yes.
>
> 2. Was a second taser cycle needed to gain control of the plaintiff's arms? A: No.
>
> 3. Did Lieutenant Treubig believe that a second taser cycle was needed to gain control of the plaintiff's arms? A: Yes.
>
> 4. Was the plaintiff resisting arrest when Lieutenant Treubig used the taser the first time? A: Yes.
>
> 5. Did Lieutenant Treubig believe that the plaintiff was resisting arrest when Lieutenant Treubig used the taser the first time? A: Yes.

---

[9] The jury originally awarded no compensatory or nominal damages, and $30,000 of punitive damages. When the Court pointed out to the jury that punitive damages could not be imposed without a finding of at least nominal damages, the jury amended its damages award to include $0.25 of nominal damages.

> 6. Was the plaintiff resisting arrest when Lieutenant Treubig used the taser the second time? A: No.
>
> 7. Did Lieutenant Treubig believe that the plaintiff was resisting arrest when Lieutenant Treubig used the taser the second time? A: Yes.

May 24, 2018, Tr. 18-19. In short, the jury found that the plaintiff was resisting arrest when the defendant first used the taser, that the defendant warned the plaintiff before using the taser, and that the defendant believed that a second taser cycle was needed to gain control of the plaintiff's arms. However, the jury also found that a second taser cycle was not in fact necessary to gain control of the plaintiff's arms, and that even though the defendant believed the plaintiff was resisting arrest when he used the taser a second time, the plaintiff was not actually resisting arrest at that time.

When, as here, "the [C]ourt does not grant a motion for judgment as a matter of law" made during trial and submits the case to the jury, "the movant may file a renewed motion for judgment as a matter of law . . . no later than 28 days after the jury [is] discharged." Fed. R. Civ. P. 50(b). The defendant timely renewed his motion for judgment as a matter of law on qualified immunity grounds.

## II.

### A.

"Qualified immunity balances two important interests -- the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). Qualified immunity generally protects government officials when performing discretionary functions, such as arrests, "from liability for civil damages" if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Plumhoff v. Rickard, 572 U.S. 765, 778-79 (2014); Ashcroft v. Iqbal, 556 U.S. 662, 672 (2009); Malley v. Briggs, 475 U.S. 335, 341 (1986) ("As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law."); Heard v. City of N.Y., 319 F. Supp. 3d 687, 696 (S.D.N.Y. 2018).

A right is clearly established when "existing precedent place[s] the conclusion that [the defendant] acted unreasonably in the[] circumstances beyond debate." Mullenix v. Luna, 136 S. Ct. 305, 309 (2015) (per curiam) (internal quotation marks omitted). "[T]he salient question . . . is whether the state of

the law" at the time of the defendant's conduct "gave [the defendant] fair warning that [his] alleged treatment of [the plaintiff] was unconstitutional." Hope v. Pelzer, 536 U.S. 730, 741 (2002). If the state of the law at the time of the defendant's conduct did not give fair warning that such conduct was unlawful, then the defendant is entitled to qualified immunity. Id. at 741.

When a jury reasonably finds that a defendant violated a plaintiff's Fourth Amendment right to be free from excessive force, courts may still grant a defendant's motion for qualified immunity. See Saucier v. Katz, 533 U.S. 194, 201-04 (2001), overturned on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009). Although excessive force claims -- like qualified immunity claims -- are analyzed under a standard of objective reasonableness, see Graham v. Connor, 490 U.S. 386, 399 (1989), these standards are separate and distinct, Saucier, 533 U.S. at 204 ("The inquiries for qualified immunity and excessive force remain distinct."); cf. Aczel v. Labonia, 584 F.3d 52, 57 (2d Cir. 2009) (holding that even when an officer has violated a plaintiff's constitutional rights, if "the police officer proves the facts that entitle him to qualified immunity . . . judgment must be entered in his favor, notwithstanding his having violated the plaintiff's rights").

Whether a defendant used excessive force is a question of fact that requires the jury to consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396 (citing Tennessee v. Garner, 471 U.S. 1, 8-9 (1985)). Whether a defendant is entitled to qualified immunity is a question of law, asking whether the right at issue was "clearly established in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Saucier, 533 U.S. at 202. "The qualified immunity inquiry," therefore, "has a further dimension. The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." Id. at 205. Therefore, the question before the Court differs from the question presented to the jury.

B.

In his motion, the defendant does not contest the jury's finding of excessive force. Accordingly, the Court considers only whether the defendant is entitled to qualified immunity for his use of excessive force. The operative question before the Court is whether the law was clearly established at the time of

the defendant's conduct such that his use of a taser two times in rapid succession while assisting in the arrest of the plaintiff constituted excessive force in violation of the Fourth and Fourteenth Amendments, so that any reasonable officer in the defendant's position would have understood that the officer was violating the plaintiff's rights.

The Supreme Court has stressed that "clearly established law must be particularized to the facts of the case." White v. Pauly, 137 S. Ct. 548, 552 (2017) (per curiam) (internal quotation marks omitted). Because the border "between excessive and acceptable force" can be "hazy," Saucier, 533 U.S. at 206 (internal quotation marks omitted), "existing precedent must have placed the statutory or constitutional question beyond debate," for the right to be clearly established, White, 137 S. Ct. at 551 (internal quotation marks omitted). The Supreme Court has repeatedly told courts "not to define clearly established law at a high level of generality . . . The dispositive question is whether the violative nature of particular conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." Mullenix, 136 S. Ct. at 308 (internal quotations marks and citations omitted). While there need not be a case that presents exactly the same facts as this case, Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011), the right must be

"sufficiently clear that every reasonable official would have understood that what he is doing violates that right," Mullenix, 136 S. Ct. at 308 (citing Reichle v. Howards, 566 U.S. 658, 664 (2012)).

1.

When Lt. Treubig arrested the plaintiff, there was no clearly established law from the Supreme Court or the Court of Appeals for the Second Circuit that would have warned Lt. Treubig that his use of a taser the first time was in violation of clearly established law. The plaintiff was resisting arrest and refusing to be handcuffed. He kept his left arm beneath him. Four officers had been unable to finish handcuffing the plaintiff. Lt. Treubig warned the plaintiff that if the plaintiff refused to give the officers his arm, Lt. Treubig would tase him. The plaintiff verbally refused and plainly resisted by saying, "I'm not going to jail." Tr. 145, 198.

There was no Supreme Court case at the time (or since) that concerned the use of a taser or other stun mechanism in a similar factual context.

The most analogous decision from the Court of Appeals for the Second Circuit indicated that the use of tasers was not excessive force in violation of the Fourth and Fourteenth Amendments when they were used against protesters who were resisting arrest. Crowell v. Kirkpatrick, 400 F. App'x 592, 595

(2d Cir. 2010) (summary order). In that case, protestors had chained themselves to a barrel and refused to free themselves. The Court of Appeals noted the following circumstances: "The officers attempted to use other means to effectuate the arrest, none of which proved feasible, and used the taser only as a last resort, after warning Plaintiffs and giving them a last opportunity to unchain themselves from the barrel and leave the premises peacefully." Id. The Court concluded that there was no constitutional violation and that, in any event, the officers were entitled to qualified immunity because it "certainly was not clearly established that the use of force here violated Plaintiffs' constitutional rights under the case law of the Supreme Court or this Circuit." Id.

Similarly, in McLeod v. Town of Brattleboro, 548 F. App'x 6 (2d Cir. 2013) (summary order), the Court of Appeals affirmed the grant of summary judgment dismissing a claim brought under § 1983 against an officer who used a taser against a suspect. Id. at 9. The Court found that no reasonable juror could find that the officer used excessive force when he tased a suspect who, after a high speed chase, exited his vehicle and kneeled on the ground, but then rose from the ground. Id. at 8. "Rising from the ground rather than submitting to arrest exacerbated a tense, uncertain, and rapidly evolving situation that threatened

14

the lives of officers, bystanders, and [the suspect] himself."
Id. (internal quotation marks omitted).

A third case from the Court of Appeals involved the use of
pepper spray rather than a taser, and provided no "fair warning"
that Lt. Treubig's use of the taser in this case was
unconstitutional. In Tracy v. Freshwater, 623 F.3d 90 (2d Cir.
2010), the Court of Appeals found that summary judgment could
not be granted dismissing a claim of excessive force against an
officer who used pepper spray against the plaintiff. Id. at 104.
The Court found that there were material issues of fact whether
the pepper spray was used before or after the plaintiff was
placed in handcuffs and whether the plaintiff was resisting
arrest at the time. Id. at 98. In this case, it is undisputed
that the plaintiff was not in handcuffs at the time of either
taser cycle, was resisting arrest at the time of the taser was
first deployed, and that Lt. Treubig believed the plaintiff was
still resisting arrest at the time of the second taser cycle.

There was in short, no "fair warning" that the first use of
the taser violated the plaintiff's constitutional rights as
explained by any case from the Supreme Court or the Court of
Appeals for the Second Circuit at the time of the plaintiff's
arrest.

The plaintiff concentrates on the second use of the taser, but there is nothing in the cases from the Supreme Court or the Court of Appeals for the Second Circuit that gave "fair warning" that the second use of the taser was unconstitutional at the time of the plaintiff's arrest.

The second use of the taser occurred shortly after the first use and lasted five seconds. It is clear that the officers had still not been able to subdue the plaintiff sufficiently to finish placing handcuffs on him. The plaintiff was rising from the floor at the time. The jury found that Lt. Treubig believed -- although incorrectly -- that the plaintiff was resisting arrest and that the second use of the taser was needed to gain control of the plaintiff's arms. That Lt. Treubig's belief that the plaintiff was resisting arrest was mistaken does not preclude a determination that Lt. Treubig is entitled to qualified immunity. Cf. Kisela v. Hughes, 138 S. Ct. 1148, 1150-52 (2018) (per curiam) (finding that a defendant officer, Kisela, was entitled to qualified immunity for his shooting of the plaintiff even though Kisela's belief that the plaintiff posed a danger to a bystander was mistaken); see also Pearson, 555 U.S. at 231 (explaining that the doctrine of qualified immunity "applies regardless of whether the government official's error is a mistake of law," or as in this case, "a

mistake of fact" (internal quotation marks omitted)). There is no basis to find that Lt. Treubig was an unreasonable officer. He plainly made a split-second decision in a stressful situation. "This is far from an obvious case in which any competent officer would have known that [the officer's conduct] would violate the Fourth Amendment." Kisela, 138 S. Ct. at 1153. The plaintiff suffered no permanent injuries from the second use of the taser and walked to an ambulance shortly after being handcuffed.

There is no Supreme Court case that has sufficiently similar facts that would have provided Lt. Treubig "fair warning" that his second use of the taser was excessive force. The Supreme Court has never decided a case that established that the use of a taser -- whether a single time or multiple times -- constitutes excessive force. And the Supreme Court has repeatedly "cautioned against the '20/20 vision of hindsight' in favor of deference to the judgment of reasonable officers on the scene." Saucier, 533 U.S. at 205 (citation omitted). This is because, as in this case, "police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving." Plumhoff, 572 U.S. at 775 (internal quotation marks omitted).

Similarly, no case from the Court of Appeals for the Second Circuit decided prior to April 7, 2015, the date of the

plaintiff's arrest, provided fair warning that the second use of the taser violated the plaintiff's clearly established constitutional rights.

The two cases discussed above that involved the use of a taser -- Crowell and McLeod -- both concerned the one-time use of a taser. But nothing in those cases suggests that the use of the taser the second time under the circumstances of this case was an excessive use of force. Similarly, to the extent pepper spray can be analogized to the use of a taser, Tracy concerned a one-time use of pepper spray, but there were issues of fact as to whether the plaintiff was even in handcuffs at the time the officer used pepper spray against the plaintiff. 623 F.3d at 98. In this case, it is undisputed that the plaintiff was not in handcuffs when Lt. Treubig recycled the taser, and Lt. Treubig believed, although mistakenly, that the plaintiff was still resisting arrest at that time.

In short, no case from the Second Circuit Court of Appeals provided "fair warning" to Lt. Treubig that his recycling the taser in the factual context of this case constituted an excessive use of force.[10]

---

[10] The plaintiff cites two district court opinions from this Circuit that were issued prior to the arrest in this case for the proposition that the plaintiff's right was clearly established. District court opinions do not provide clearly established law. In any event, these cases do not clearly establish the right at issue. Negron v. City of New York, 976 F. Supp. 2d 360 (E.D.N.Y. 2013), found that deployment of a taser violated a plaintiff's clearly established rights, but that

Cases that were decided after the plaintiff's arrest could not have provided Lt. Treubig with fair warning that his use of the taser, either the first or second time, was clearly in violation of the plaintiff's constitutional rights.

The Supreme Court has decided one case involving the use of a taser, but the facts were dramatically different from those in this case, and the specific issue before the Supreme Court was not whether the defendant officers used excessive force or were entitled to qualified immunity, but rather whether the requirement of a § 1983 excessive force claim brought by a pre-trial detainee must satisfy a subjective standard based on the defendant's state of mind or only a standard that the force was objectively unreasonable. Kingley v. Hendrickson, 135 S. Ct. 2466, 2471-72 (2015). In Kingsley, a sergeant directed another officer to tase the plaintiff, a pre-trial detainee, who was laying face down on his bunk with his hands handcuffed behind

---

was in part because the plaintiff was standing in a precarious position on top of a store front, ten feet off the ground, at the time of the incident. Id. at 364. Because of the plaintiff's precarious position, the plaintiff fell to his death when he was tased. Id. at 363. The plaintiff's precarious position at the time of tasing made the degree of force in that case greater than what was used here. Garcia v. Dutchess Cty., 43 F. Supp. 3d 281 (S.D.N.Y. 2014), declined to grant summary judgment because there were genuine issues of material fact such that a jury could reasonably conclude that the plaintiff was not resisting arrest, had already been restrained when the taser was used, and did not pose a threat to the officers when he was tased. Id. at 291, 293.

his back after the two officers had allegedly slammed the pre-trial detainee's head into the concrete bunk. Id. at 2470. Neither the facts of Kingsley, nor the issue presented indicate that Lt. Treubig violated the plaintiff's constitutional rights when he used the taser two times in quick succession against the plaintiff.

Similarly, subsequent cases from the Court of Appeals for the Second Circuit do not provide any support to the plaintiff's argument that Lt. Treubig's use of the taser violated clearly established law in the specific context of this case. Soto v. Gaudett, 862 F.3d 148 (2d Cir. 2017), involved the use of tasers but not in a factual context similar to this case. In that case, Soto, the plaintiff, fled from the police and was hit by a police cruiser. Id. at 152-53. Soto nevertheless continued to flee and defendant Csech tased Soto after warning him to stop. Id. at 153. When Soto was on the ground, two other officers shot Soto with tasers while Soto was entangled with taser wires. Id. The Court of Appeals affirmed the grant of summary judgment to Officer Csech based on qualified immunity because "no precedent . . . established that a suspect who was fleeing had a right not to be stopped by means of a taser." Id. at 159. The Court found that it lacked jurisdiction to decide whether the other officers who used tasers were entitled to qualified immunity because there were issues of fact concerning the circumstances

under which they tased Soto. Id. at 160-61. There was evidence
that Soto was incapacitated and compliant and had not gotten up,
and that he was on the ground in no position to flee. Id. at
161. All of those facts distinguish Soto from this case.

Other cases from the Second Circuit Court of Appeals
decided after the plaintiff's arrest have involved the use of a
taser but do not show that, even today, Lt. Treubig's use of a
taser violated clearly established law.

Estate of Jaquez v. City of New York, 706 F. App'x 709 (2d
Cir. 2017) (summary order), supports a finding of qualified
immunity in this case although the force used in that case was
far more severe than the use of the taser in this case. Estate
of Jaquez involved a suspect, Jaquez, who attacked officers with
a knife as they tried to arrest him. The officers repeatedly
deployed their tasers and "three to four rubber bullets from a
'Sage gun.'" Id. at 712. These methods did not work, and Jaquez
continued attacking the officers with his knife. The officers
fired live ammunition. Jaquez was "struck with four bullets, one
of which, according to the medical examiner, ultimately proved
fatal." Id. When shot by these bullets, Jaquez fell to the
ground. One officer perceived Jaquez "to be pushing himself off
the floor" and "fired a final shot of live ammunition that
struck Jaquez in the head." Id.

The Court of Appeals found that summary judgment was appropriately granted to the officers on the grounds of qualified immunity with respect to the use of non-lethal and lethal force up to the final shot of live ammunition. Id. at 714-15. The Court concluded that reasonable officers could disagree whether that response to the plaintiff's conduct was a reasonable response. Id. The Court of Appeals also found that the district court did not err in denying a motion for directed verdict for the plaintiff with respect to the final shot of live ammunition. Id. at 715. This is because "the jury was able to conclude that [the defendant] reasonably perceived Jaquez as a continued threat." Id. at 716. Despite the fact that Jaquez had already been shot by four bullets, one of which proved to be lethal, Jaquez "was pushing himself up off the floor prior to the moment [the defendant] fired the final shot." Id.

Two other recent decisions from the Court of Appeals with respect to the use of tasers do not suggest that Lt. Treubig's use of his taser against the plaintiff violated clearly established law. See Bryant v. Egan, 890 F.3d 382, 386 (2d Cir. 2018) (dismissing appeal of an order denying qualified immunity because there were factual issues relevant to the appeal that deprived the court of appeals of jurisdiction); McKinney v. City of Middletown, 712 F. App'x 97, 98 (2018) (summary order) (remanding excessive force claims, including a claim for the use

of a taser, and expressing "no view on whether the Officers will ultimately be entitled to qualified or governmental immunity for the claims against them").[11]

4.

The plaintiff also cites out-of-circuit cases to argue that the defendant violated clearly established law. The Second Circuit Court of Appeals has often held that out-of-circuit cases are not relevant to the qualified immunity inquiry. See Moore v. Vega, 371 F.3d 110, 114 (2d Cir. 2004) ("Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." (citation omitted)); Disito v. Cook, 691 F.3d 226, 247 (2d Cir. 2012); Okin v. Village of Cornwall-on-Hudson Police Dept., 577 F.3d 415, 433 (2d Cir. 2009). However, "[t]here is some tension in this Court's case law concerning whether out-of-circuit precedent can ever clearly establish law in this Circuit." Brown v. City of N.Y., 862 F.3d 182, 191-92 (2d Cir. 2017) (citations omitted). In any event, the out-of-

---

[11] Whitfield v. City of Newburgh, No. 18cv8516, 2015 WL 9275695 (S.D.N.Y. Dec. 17, 2015), a district court case that post-dates Lt. Treubig's use of a taser, also would not provide fair warning that Lt. Treubig's use of a taser was excessive in violation of the Fourth and Fourteenth Amendments. Whitfield held that it is clearly established that "in effectuating a lawful arrest, an officer's use of force is excessive if he or she uses a taser on an individual who no longer poses an immediate threat, is engaged with a police K-9, and is physically struck by an officer." Id. at *22. The plaintiff here was not engaged with a police K-9, had not yet been subdued, and was perceived to be resisting arrest.

23

circuit cases do not clearly establish the law in the factual context of this case. "This is not a case, for example, where the law was established in three other circuits and the decisions of our own court foreshadowed the establishment of the rule of law" on which the plaintiff relies. Id. at 192 (internal quotation marks omitted). Regardless of the weight afforded to the plaintiff's out-of-circuit cases, none of these cases clearly establish that the defendant's use of a taser against the plaintiff violated the plaintiff's constitutional rights.

The plaintiff relies, for example, on Goodwin v. City of Painesville, 781 F.3d 314 (6th Cir. 2015), a case that dealt with substantially different facts. In Goodwin, the defendant officers entered the apartment of Mr. and Mrs. Nall, and, without warning, tased Mr. Nall because Mr. Nall did not leave his apartment when asked to do so. Id. at 323. Mr. Nall was tased a second time when he was "convulsing uncontrollably and had ceased all resistance during the tasering," and there was "ample evidence in the record that [Mr. Nall] did not have control of his body during the ordeal." Id. at 324. The first tasing in Goodwin lasted twenty-one seconds -- more than four times longer than each of the five second taser cycles suffered by the plaintiff here. Id. at 319. Unlike the plaintiff in this case, the injuries inflicted by the defendants in Goodwin were horrific. Mr. Nall was drooling or foaming from the mouth and

did not appear conscious after the taser attack when he was removed from the apartment. Id. Mr. Nall stopped breathing after paramedics arrived, and he went into full cardiac arrest at the scene. Id. at 317. He suffered "severe cognitive impairment that greatly affect[ed] his memory and executive functioning." Id. at 320.

The Sixth Circuit Court of Appeals acknowledged that there is "no clearly established right for a suspect who 'actively resists' and refuses to be handcuffed to be free from a taser application." Id. at 325. But the Court of Appeals affirmed the denial of summary judgment on qualified immunity grounds to the defendant officer because it was not clear that Mr. Nall, unlike the plaintiff in this case, was actively resisting arrest during the first taser application. The court also found that the defendant officer did not have qualified immunity for the prolonged taser application in view of the changes in Mr. Nall's physical state, a condition also not present in this case.

The plaintiff also cites De Boise v. Taser Intern., Inc., 760 F.3d 892 (8th Cir. 2014), which ultimately upheld a district court's finding of qualified immunity when officers tased a violent suspect more than eight times. Id. at 895-96. On his way to the hospital, that suspect went into cardiac arrest and died. Id. at 896. The Court of Appeals determined that, even if the repeated tasings of the suspect amounted to excessive force in

violation of the Fourth Amendment, the right to be free from such force was not clearly established at the time of the incident. Id. at 898. The portion of the case cited by the plaintiff -- which is not necessary to the case's holding -- states that "non-violent, non-fleeing suspects have a clearly established right to be free from the uses of tasers." Id. at 897 (citing Brown v. City of Golden Valley, 574 F.3d 491, 499-500 (8th Cir. 2009)). But the plaintiff in this case was actively resisting arrest when Lt. Treubig deployed the taser the first time, and Lt. Treubig reasonably believed that the plaintiff was still actively resisting arrest when he cycled the taser the second time, and it is clear that the officers did not successfully handcuff the plaintiff until after the second taser cycle.

In Oliver v. Fiorino, 586 F.3d 898, 901 (11th Cir. 2009), also cited by the plaintiff, an officer "tasered [the plaintiff] at least eight and as many as eleven or twelve times with each shock lasting at least five seconds." Id. at 901. Unlike the defendant in this case, the officers "made no attempt to handcuff or arrest [the plaintiff] at any time during or after any Taser shock cycle." Id. In Oliver, "the officer continued to administer Taser shocks to [the plaintiff] while he was lying on the hot pavement, immobilized and clenched up, and . . . these Taser shocks resulted in extreme pain and ultimately caused [the

plaintiff's] death." Id. After the plaintiff was first shocked by the taser, "he scream[ed] in pain" that the asphalt was "too hot." Id. at 903. After additional taser cycles, the plaintiff collapsed "because he had no control over his body." Id. When the plaintiff was finally handcuffed, "he began foaming at the mouth." Id. at 904. The Court of Appeals affirmed the denial of summary judgment to the officers based on qualified immunity grounds.

The force used in Oliver was substantially more significant than that used here, and the Eleventh Circuit Court of Appeals held that the force "was so plainly unnecessary and disproportionate that no reasonable officer could have thought that this amount of force was legal under the circumstances." Id. at 908. Moreover, the officers in Oliver did not attempt to handcuff the plaintiff during or between tasings, whereas the defendant in this case ceased tasing the plaintiff as soon as the other officers were able to handcuff the plaintiff.

The remaining out-of-circuit cases cited by the plaintiff similarly involve the use of tasers by police officers in situations that either involved more force than that used by Lt. Treubig or where the plaintiffs did not pose any threat and were not resisting arrest. See Meyers v. Baltimore Cty. Md., 713 F.3d 723, 735 (4th Cir. 2013) (holding that the last seven of ten taser deployments, which ultimately killed the plaintiff, were

unreasonable where the plaintiff "was unarmed and effectively was secured with several officers sitting on his back"); Cavanaugh v. Woods Cross City, 625 F.3d 661, 663, 665 (10th Cir. 2010) (holding that it was unreasonable for an officer to tase a woman resulting in a traumatic brain injury where the woman posed no threat to anyone, was not resisting or fleeing arrest, and had not even been told that she was under arrest or warned that she would be tased); Casey v. City of Fed. Heights, 509 F.3d 1278, 1279 (10th Cir. 2007) (finding that an excessive force claim should survive summary judgment on qualified immunity grounds where the plaintiff, walking into a courthouse to pay a parking fine, "was grabbed, tackled, Tasered, and beaten by city police officers"). And contrary to the plaintiff's assertions, one of the out-of-circuit cases cited by the plaintiff arguably supports a finding of qualified immunity in this case. See Hagans v. Franklin Cty. Sheriff's Office, 695 F.3d 505, 509 (6th Cir. 2012) (stating that cases from the Sixth and other circuits hold that "[i]f a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him" and noting that this applies to "using a taser repeatedly").

In short, none of the cases cited by the plaintiff clearly established the plaintiff's right to be free from Lt. Treubig's use of a taser for the two times it was used, and some of the

cases indicate that there was no such clearly established right. The relevant precedent at the time of the defendant's conduct certainly did not put the legality of Lt. Treubig's two uses of the taser "beyond debate." al-Kidd, 563 U.S. at 741.

5.

The plaintiff contends that the jury's award of punitive damages forecloses a finding of qualified immunity because the jury must have found that Lt. Treubig acted with malice when he tased the plaintiff.[12] But any such finding is irrelevant to the issue of qualified immunity. See Anderson, 483 U.S. at 641 (explaining that qualified immunity is an objective inquiry asking what "a reasonable officer could have believed"); cf. Crawford-El v. Britton, 523 U.S. 574, 588, 592 (1966) (stating that "[t]he immunity standard in Harlow itself eliminates all motive-based claims in which the official's conduct did not violate clearly established law" and "a defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated").

While subjective motive is irrelevant to a determination of qualified immunity, a reasonable officer's perception of the facts as they existed at the time is relevant. On the special verdict form, the jury expressly found that Lt. Treubig believed

---

[12] The correctness of the jury's determination of punitive damages has not been raised on the current motion.

the plaintiff was resisting arrest before both the first and the second taser cycles, although Lt. Treubig was mistaken in concluding that the plaintiff was resisting arrest before the second taser cycle. The jury also found that Lt. Treubig believed, although mistakenly, that the second taser cycle was needed to gain control of the plaintiff's arms.

A jury's award of punitive damages is a finding of fact that depends on the jury's determination of the subjective motivation of a defendant's actions. See Cameron v. City of N.Y., 598 F.3d 50, 69 (2d Cir. 2010). The determination of qualified immunity is a question of law for the Court that depends on a determination of whether the law was clearly established so that "every reasonable official would have understood that what he is doing violates that right." Mullenix, 136 S. Ct. at 308 (internal quotation marks omitted). Because the two inquiries are distinct, a finding of punitive damages does not preclude the grant of qualified immunity.

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the reasons explained above, Lt. Treubig's motion for judgment as a matter of law on qualified immunity grounds is **granted**.

**SO ORDERED.**

Dated:     **New York, New York**
           **November 21, 2018**

                                   **John G. Koeltl**
                    **United States District Judge**