**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MATTHEW JONES,

                Plaintiff,                        16 **CIVIL** 8080 (JGK)

      -against-

CITY OF NEW YORK, et al.,            **DECLARATION OF AMIR H. ALI**
                                           **IN SUPPORT OF PLAINTIFF'S**
               Defendants.       **APPLICATION FOR ATTORNEY'S**
                                             **FEES AND COSTS**

I, Amir H. Ali, declare:

1.      I serve as Director of the Roderick & Solange MacArthur Justice Center's ("MJC") Washington, D.C. office and Deputy Director of the organization's Supreme Court & Appellate Program.

2.      I also direct Harvard Law School's Criminal Justice Appellate Clinic. I have taught courses on Supreme Court & Appellate Litigation and Constitutional Litigation at Harvard and Georgetown Law School, respectively.

3.      Prior to my current role, I practiced in the appellate practice of a national law firm. Before that, I served as law clerk to the Honorable Raymond C. Fisher of the U.S. Court of Appeals for the Ninth Circuit and to Justice Marshall Rothstein of the Supreme Court of Canada. I graduated *magna cum laude* from Harvard Law School in 2011.

4.      MJC is a nonprofit public interest firm, which litigates important civil rights issues ranging from police misconduct, criminal procedure and sentencing, prison and jail conditions, solitary confinement, wrongful death and wrongful convictions, and habeas corpus.

5.      MJC's Supreme Court & Appellate Program consists of five full-time attorneys with specialized expertise in appellate and civil-rights litigation. Each of the full-time attorneys

has clerked for a federal court of appeals, and multiple have clerked for U.S. Supreme Court Justices.

6.      In cases in which MJC's Supreme Court & Appellate Program has entered on appeal, it has succeeded in obtaining reversal in roughly 85% of them, approximately ten times the national average rate of reversal in federal appeals.[1]

7.      I have litigated dozens of appeals on civil rights and criminal justice issues in most federal courts of appeal (the Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits) and the Supreme Court of the United States.

8.      I have successfully argued two cases in the U.S. Supreme Court. In *Welch v. United States*, 136 S. Ct. 1257 (2016), I obtained a 7-1 decision in my client's favor, holding that the invalidation of a federal mandatory minimum sentence as unconstitutionally vague applies retroactively on federal collateral review.  In *Garza v. Idaho*, 139 S. Ct. 738 (2019), I obtained a 6-3 decision in my client's favor, holding that a defense attorney who fails to file a requested notice of appeal renders constitutionally deficient and presumptively prejudicial performance, even where the defendant explicitly waived his right to appeal in a plea agreement.

9.      In recent years, I have been retained by victims of police violence across the country to argue some of the most significant appeals concerning the doctrine of qualified immunity. For instance, last year I was retained by shooting victim Ryan Cole and his family to argue before eighteen judges of the *en banc* Fifth Circuit, and obtained an 11-7 decision holding

---

[1] *See* ADMINISTRATIVE OFFICE OF THE U.S. COURTS, JUST THE FACTS: U.S COURTS OF APPEALS (2016), https://www.uscourts.gov/news/2016/12/20/just-facts-us-courts-appeals (noting an average rate of reversal of 8.6%).

that Texas police officers violated clearly established law when they shot Ryan. *See Cole v. Carson*, 935 F.3d 444 (5th Cir. 2019) (en banc), *cert. denied*, *Hunter v. Cole*, No. 19-753, 2020 WL 3146695 (U.S. June 15, 2020). I was also retained by the estate and family of Marquez Smart on appeal to the Tenth Circuit, and obtained a unanimous decision reversing qualified immunity to the officer who shot and killed Mr. Smart in downtown Wichita, Kansas. *See Smart v. City of Wichita*, 951 F.3d 1161 (10th Cir. 2020).

10.     Neither I nor the MacArthur Justice Center had any relationship with the plaintiff Matthew Jones or his trial counsel in this matter until after the trial and the grant of qualified immunity to Lieutenant Christopher Treubig.

11.     Following the grant of qualified immunity, MJC's Supreme Court & Appellate Program identified as one which raised issues of national importance and had potential grounds for appeal, but presented a significant risk of going without any appeal. This concern was driven by the fact that the case did not involve any compensatory damages and that the jury's award of $30,000.25 would provide insufficient financial incentive for an appeal of this complexity.

12.     In November 2018, I contacted Alexis Padilla and David Zelman to offer assistance on appeal to the U.S. Court of Appeals for the Second Circuit. Mr. Padilla and Mr. Zelman indicated to me that they were considering forgoing any appeal given the time required to litigate an appeal and the unlikelihood of overcoming qualified immunity on appeal.

13.     MJC agreed to represent Mr. Jones without any charge or contingency fee, relying exclusively on the right to petition for fees in the event it succeeded on appeal.

**I.      Court Of Appeal Proceedings.**

14.     Shortly after I appealed this matter for the plaintiff, the parties were ordered to participate in mediation.

15.     Counsel for the City emailed the assigned mediator to "request the cancellation of the mediation." Exhibit D.[2] Counsel informed the mediator that "the City's position is that this is a 'no-pay' case." *Id*. Counsel stated "I have confirmed that this remains the City's position, and I do not foresee that this position will change in light of the facts and procedural posture of the case." *Id*.

16.     The mediator denied the City's request to cancel mediation. *Id*. On February 28, 2019, the parties participated in a telephonic mediation. Mr. Zelman represented Mr. Jones at the mediation and made an initial settlement offer in the amount of the jury's verdict $30,000.25, exclusive of attorney's fees for the trial. The City did not make any offer in response.

17.     The complexity of this appeal was enhanced because it followed a full trial and post-trial proceedings. Because the issue on appeal concerned the propriety of granting judgment as a matter of law, it required comprehensive review of the testimony and evidence presented, as well as the numerous letter and oral motions made during and following trial.

18.     Of the many dozens of appeals I have worked on in my career, the issues briefed in this case were among the most complex and research-intensive. It presented numerous issues of considerable complexity, including the intersection of the following issues:

        a.   The constitutional standards governing law enforcement use of force and excessive force;

        b.   The doctrine of qualified immunity;

        c.   The U.S. Court of Appeals for the Second Circuit's deep body of caselaw concerning the procedures for supplemental interrogatories;

---

[2] I certify that Exhibit D is a true and correct copy of the City's email exchange with the mediator.

4

     d.  The constitutional standards surrounding the Seventh Amendment right to a jury in a civil trial.

19.    Upon reviewing the record in this case, my team identified two potential grounds for reversal: (1) that the jury's verdict and supplemental interrogatories may have reflected its conclusion that Lieutenant Treubig tased petitioner twice when confronted with purely passive resistance, in violation of clearly established law; and (2) that the jury's verdict and supplemental interrogatories may have reflected its conclusion that Lieutenant Treubig tased plaintiff when he was no longer resisting at all, in violation of clearly established law.

20.    The legal standards governing qualified immunity, which require a plaintiff to show not only that there was a violation of constitutional law, but also to identify caselaw that is particularized to the facts of the present case, require comprehensive and fact-intensive research to identify cases that involve similar context and uses of force. This is especially so given that this showing is made either through binding precedent or "a consensus of cases of persuasive authority" from other jurisdictions, *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020), and this intensive research must therefore take place across the decisional law of all federal circuits. My team had to conduct such research and analysis for each of the two bases for denying qualified immunity.

21.    Consistent with the complexity and research-intensive nature of the appeal, we filed a 55-page opening brief on behalf of the plaintiff, which included in-depth analysis of cases across all circuits.

22.    In response to plaintiff's opening brief, the City filed a 48-page response brief. In that response, the City did not defend this Court's reasoning for granting qualified immunity to Lieutenant Treubig, which had been premised on the conclusion that the plaintiff was "pushing

himself off the ground" at the time of the second tasing. *Jones v. Treubig*, 963 F.3d 214, 229 (2d Cir. 2020); Appellant's Reply Br. 8. The City instead defended the Court judgment on new, alternative reasoning that "the uncontroverted evidence still demonstrated that Jones continued to resist arrest at the time of the second tasing." *Jones*, 963 F.3d at 229. This argument was premised on a novel account of the witness testimony at trial, *see id.* at 229-30, and dozens of cases that the City cited for the first time.

23.     Similar to the plaintiff's brief, the City argued their case by relying on a comprehensive canvass of cases across all circuits. For instance, the City's table of authorities alone spanned nine pages and included over three dozen out-of-circuit cases.

24.     In addition to advancing a novel theory on appeal, the City's response brief raised novel legal questions of serious consequence to this case and civil rights law generally. This included the following legal propositions:

    a.   That it is an open question whether out-of-circuit precedent "can ever" clearly establish the law for the purposes of qualified immunity. *See* Appellee Br. 2, 32-33.

    b.   That cases whose publication dates "postdate the incident" in this case could not be relied upon for the purposes of qualified immunity. Appellee Br. 29, 33.

    c.   That caselaw involving the use of force against a person who is not resisting is not sufficiently particularized, and therefore must be disregarded, unless the non-resisting person was "secured" by restraints. Appellee Br. 2, 16, 20, 21, 27.

25.     Given the City's new evidentiary account and novel legal arguments, my team had to conduct new research and devote whole sections of our reply brief to those new arguments. *See* Appellant's Reply Br. at 7-8, 11-15.

26.     In addition, the City's brief had several times construed facts and evidence in disregard of the standard of review, and in some instances referred to facts that we could not locate anywhere in the record. Our reply brief accordingly had to provide its own complete and precise account of the trial record and evidence. *See id.* at 15-19; *see also id.* Attachment A.  We accordingly filed a maximum-length reply brief of 26 pages.

27.     In preparation for oral argument, I participated in two moot oral arguments, which I consider to be an essential step for an appeal of such legal and factual complexity. For each moot, between three and five experienced appellate practitioners reviewed the appellate briefing and participated as judges while I advocated and answered questions for approximately one hour. This was followed by a one-hour discussion, wherein the participants provided feedback on what worked and what did not work. I have not sought any compensation for the time spent by the moot participants.

28.     The novel and important issues in this case attracted the attention of a national think tank, the Cato Institute. The Cato Institute filed a 27-page amicus brief in support of Mr. Jones.

29.     On December 11, 2019, I traveled to New York and presented oral argument on behalf of the plaintiff before of a three-judge panel of the U.S. Court of Appeals for the Second Circuit.

30.     Consistent with the complexity of this appeal, the three-judge panel allowed counsel for both parties to greatly exceed the time they had been allotted for oral argument. In

total, oral argument lasted nearly twice the scheduled duration. At the conclusion of oral

argument, the presiding judge noted that the appeal was "very well argued" by both sides.

31.     As part of this appeal, my team also had an obligation to my client and to the

Court of Appeals to apprise the Court of any pertinent and significant authorities that may affect

its decision on appeal under Federal Rule of Appellate Procedure 28(j). Given the frequency with

which federal courts of appeals issue decisions concerning excessive force and qualified

immunity, this required review of numerous cases. As an example, eight days before oral

argument, the Eighth Circuit issued a decision denying qualified immunity in a case which

involved (1) repeat use of (2) a taser (3) in cartridge-mode (4) against a misdemeanant (5) on the

floor (6) without warning, necessitating a letter of supplemental authority.

32.     On June 26, 2020, the Court of Appeals issued a 57-page published opinion in

favor of the plaintiff.

33.     In addition to myself, I had one law clerk or junior attorney assigned to this

appeal at a given time to complete supporting research in this matter. From January 2019 through

September 2019, this person was David Schmutzer, a legal fellow at MJC who graduated from

UCLA Law School in in 2018 and was admitted to the New York bar in July 2019. From

September 2019 to present, this person was Megha Ram, a legal fellow at MJC who is a 2018

graduate of Yale Law School, admitted to the California bar in February 2019, and had clerked

for the Honorable Michael P. Shea of the U.S. District for the District of Connecticut.

34.     I have reviewed both Mr. Schmutzer and Ms. Ram's time records and excluded

any time that I believe to be unnecessary. This included "zeroing" out time for research that was

not used or for time required to get up to speed, and reducing time for research that was only

partially used or based on efficiency. These time entries, with my reductions, are included as Exhibit B to this declaration.

35.     Ms. Ram also traveled with me and attended the oral argument. I have excluded the time associated with her travel and attendance from this fee application.

36.     Over the life cycle of this appeal, four law school students completed research memos and analysis related to this case. Although such time is generally compensable under the law of this Circuit, *see, e.g.*, *Medina v. Buther*, No. 15-CV-1955(LAP), 2019 WL 4370239, at *8 (S.D.N.Y. Sept. 12, 2019) (applying a rate of $125), I have not sought compensation for any student time in this application.

37.     Over the course of this appeal, my paralegal devoted time to cite-checking, formatting, and preparing our opening and reply brief on appeal, as well as tasks related to preparation for oral argument. Although such time is generally compensable under the law of this circuit, *id.* at *8 (recognizing a rate of $125), I have not sought compensation for any paralegal time in this application.

## II.     Post-Remand Proceedings

38.     Following issuance of the Court of Appeals' mandate, this Court ordered the parties to confer regarding a joint proposed judgment. I took the lead in negotiating the potential joint proposed judgment.

39.     I exchanged over two dozen emails with opposing counsel in attempt to reach a joint proposed judgment. After I adopted several of the City's revisions to the structure and content of the proposed judgment, the City confirmed it had no objections with the accuracy of plaintiff's proposed joint judgment. Nonetheless, on the Friday that the proposed joint judgment was due, the City informed me that it would not agree to any proposed judgment which

recognized that the jury's verdict awarded nominal and punitive damages. The City's position required the parties to prepare separate letters to the Court, and to prepare and caused a status hearing. After the hearing, the Court adopted the plaintiff's proposed judgment.

40.     On August 4, 2020, I sent counsel for the City an offer of settlement for the amount of the jury's judgment and attorney's fees, which excluded any fees for post-remand work, junior associate time, student time and paralegal time. To date, the City has never responded to plaintiff's offer, necessitating this motion.

41.     My time entries for the work done throughout the appeal and following remand to this Court are attached as Exhibit A to this declaration.

**III.    Costs**

42.     In litigating this appeal, MJC also incurred the following costs:

    a.   Appeal fee of $505.00.

    b.   Cost for transcript of November 19, 2018 post-trial hearing: $144.18

    c.   Cost of printing briefs and appendix:

        i.   $42.72 (Opening Brief),

        ii.   $96.06 (Appendix) and

        iii.   $30.12 (Reply Brief).

    d.   Costs of $607.51 for travel to oral argument (train and lodging only).

The invoices for these costs are attached as Exhibit C to this declaration.

September 7, 2020                              /s/ Amir H. Ali
                                      Amir H. Ali