UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
MATTHEW JONES,                                      :

                Plaintiff,          :

       -against-                                :          **MEMORANDUM AND ORDER**

CITY OF NEW YORK, et al.,                        :          16-CV-8080 (JGK) (KNF)

            Defendants.      :
--------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

## BACKGROUND

Plaintiff Matthew Jones ("Jones") commenced this action asserting violations of his rights under the Fourth and Fourteenth Amendments to the United States Constitution pursuant to 42 US.C. §§ 1983 and 1988.  The plaintiff alleged that he was in a stairwell of a building at 112 East 128th Street in New York County with another person when defendant police officers Adam Muniz ("Muniz") and Michael Vaccaro ("Vaccaro") approached him and sought consent to a search.  The plaintiff obliged and stated he had nothing to hide.  Vaccaro frisked the plaintiff and found a prescription drug bottle containing pills in the plaintiff's front pants pocket. Vaccaro grabbed the plaintiff's right arm to handcuff him, and Muniz forced the plaintiff to the ground where the plaintiff landed on top of his left arm with Muniz and Vaccaro on top of him. Muniz and Vaccaro ordered the plaintiff to release his arm and he responded that he could not release his arm because it was pressed underneath him.  Within moments, other police officers arrived, and Undercover Officer #349 began to jab the plaintiff's left shoulder with a metal police issued ASP and demanded that he release his arm.  One of the defendants sprayed pepper spray into the plaintiff's face demanding that the plaintiff release his arm, despite the plaintiff

having no way of releasing his arm from beneath the bodies piled on top of him.  The plaintiff insisted he was not resisting when the officers suddenly let go of the plaintiff.  Before the plaintiff could stand up, he heard a voice saying, "Hit him" and felt an electric shock penetrate his body through the center of his back as Lieutenant Christopher Treubig ("Treubig") stunned him with a police issued electro-shock weapon, taser.  The plaintiff was incapacitated by the pain from the shock and was handcuffed and taken to Harlem Hospital, where his eyes were rinsed and the coils from the taser were removed from his back.  Thereafter, the plaintiff was transported to 125th Street police precinct, then to Central Booking, where he was processed, arraigned and released after being detained approximately 24 hours.  All charges against the plaintiff were dismissed.  The plaintiff sought compensatory damages, punitive damages, costs and attorney's fees.

On November 27, 2018, a judgement was entered finding that, on May 23, 2018, after the jury returned a verdict of no liability to the plaintiff by Muniz, Vaccaro and Undercover Officer #349, and awarded the plaintiff nominal damages against Treubig in the amount of $0.25, and punitive damages in the amount of $30,000, and answered special interrogatories, Treubig was entitled to qualified immunity and was not liable to the plaintiff.  See Docket Entry No. 111. The November 27, 2018 judgment was reversed on July 17, 2020, and the case remanded.  See Docket Entry No. 125.  The Second Circuit Court of Appeals stated:

> Because we conclude that it was clearly established at the time of the incident that an officer could not use significant force against an individual who was no longer resisting arrest and posing no threat to the safety of officers or other individuals, and the evidence allowed the jury to reasonably conclude that Jones was no longer resisting arrest and was not a safety threat at the time of Lt. Treubig's second use of the taser against him, we reverse the judgment of the district court and remand for proceedings consistent with this opinion.
>
> Jones v. Treubig, 963 F.3d 214, 219 (2d Cir. 2020).

2

Upon remand, the jury verdict against Treubig was reinstated and a judgment entered in favor of

the plaintiff against Treubig in the amount of $0.25 in nominal damages and $30,000 in punitive

damages. <u>See</u> Docket Entry No. 135. Before the Court is the plaintiff's application for

attorney's fees and expenses, pursuant to 42 U.S.C. § 1988, opposed by the defendant.

## PLAINTIFF'S CONTENTIONS

The plaintiff seeks: (1) $389,555 in attorney's fees for 312 hours expended by Alexis G.

Padilla ("Padilla") at an hourly rate of $500, 104.5 hours expended by David Zelman ("Zelman")

at an hourly rate of $600, 302.2 hours expended by Amir H. Ali ("Ali") at an hourly rate of $525,

36.1 hours expended by David Schmutzer ("Schmutzer") at an hourly rate of $150, and 27.1

hours expended by Meghan Ram ("Ram") at an hourly rate of $250; and (2) $3,988.04 in costs.

The plaintiff contends that the degree of success, obtained following four years of litigation, trial,

post-trial motions and appeal, culminating in a verdict and judgment in favor if the plaintiff

finding that his constitutional rights were violated and that the violation was malicious and

wanton necessitating punitive damages, as well as the unattractive nature of the case, warrant an

upward adjustment of the fees. The plaintiff argues he is a prevailing party, having obtained a

jury verdict in his favor in the amount of $30,000.25 in nominal and punitive damages, for the

violation of his constitutional right to be free from excessive force. According to the plaintiff,

the case involved depositions by both parties, trial, post-trial motions, a lengthy appeal and post-

appeal motions, and several complex legal issues, including the law governing the use of a taser

and other substantial force, the application of qualified immunity, the law governing

supplemental interrogatories and the Sixth Amendment right to a jury. "These novel issues

attracted the attention and participation of national think tanks and led to issuance of a 57-page

precedential opinion by the Court of Appeals." Thus, the duration, novelty and difficulty, and

the level of skill required justify a fee at the top end of the range.  Padilla agreed to accept the case without any guaranteed fee, on contingency alone and Zelman and Ali agreed to appear in the case without any fee to the client or contingency.  Absent the statutory right to fees and the willingness of a nonprofit to take the appeal, a substantial risk exists that the trial and appeal would have not occurred.

Padilla litigated the case from pleadings, through discovery and trial, to verdict and requests an hourly rate of $500.  Padilla graduated from Brooklyn Law School in 2012 and has been admitted to the New York bar since 2013, litigating to completion over 50 civil rights cases in the Southern and Eastern Districts of New York, as well as representing clients before the Second Circuit Court of Appeals.  His current practice is dedicated to criminal defense and civil rights litigation.  Presently, Padilla is representing plaintiffs in over one dozen federal civil rights cases and several in state courts.  He has tried twelve cases, including five federal civil rights actions involving excessive force.

Zelman was responsible chiefly for post-trial motions and seeks an hourly rate of $600.  He was admitted to the New York bar in 1999 and has been practicing in the civil rights field for 20 years, focusing on police misconduct cases.  Zelman has handled over 250 police misconduct cases and has tried or assisted in trying more than one dozen civil rights cases to verdict in federal court.  He has also briefed and argued several appeals before the Second Circuit Court of Appeals and the New York State Supreme Court, Appellate Division.  Zelman was consulted during trial and entered a formal appearance to oppose the defense motion for a directed verdict on qualified immunity.  Zelman's arguments during post-trial motions formed the basis for the appeal, and he spent considerable time with appellate counsel, Ali, to discuss the proceedings below, provide relevant documentation and collaborate on the appellate arguments.

Ali was lead and arguing counsel on the successful appeal and he seeks an hourly rate of $525. Ali graduated from Harvard Law School in 2011, and is the Director of the Washington, D.C. office of the MacArthur Justice Center, and Deputy Director of the organization's Supreme Court & Appellate Program. He teaches a Criminal Justice Appellate Clinic at Harvard Law School and has taught appellate and constitutional litigation at Harvard and Georgetown law schools. Ali worked in a national law firm's appellate practice previously. Ali has expertise in federal appellate and civil rights litigation, and he has been retained by victims of police misconduct across the country to argue civil rights appeals concerning qualified immunity. Ali litigated dozens of appeals, in the Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits, and he argued two civil rights cases in the United States Supreme Court, prevailing in both. Ali tapped junior associates to assist with research: Schmutzer, a 2018 graduate of the UCLA Law School, from January 2019 through September 2019, and Ram, a 2018 graduate of Yale Law School, from September 2019 to present. Ali requests an hourly fee of $150 for Schmutzer, since he was not admitted to the bar until after his work on the case, and an hourly fee of $250 for Ram. The plaintiff asserts that, between 2000 and 2015, the rate awarded to experienced civil rights litigators ranged from $250 to $650 and the rate for associates ranged from $200 to $350, both increasing over time, and courts have routinely awarded amounts in the $500 range to attorneys at the senior associate level.

The plaintiff argues that the hours expended by counsel were reasonable because Padilla was the sole attorney who conducted discovery and litigated the trial, Zelman litigated post-trial motions and Ali completed the appeal with the assistance of a junior associate. Furthermore, the record shows that counsel limited discovery and sought repeatedly to narrow the claims at issue. For example, the plaintiff

deposed only the officers who had been identified and present during the events, including deposing two on the same day to save time and money. Mr. Jones did not rely on any expert witnesses, though he reasonably could have concerning reasonable police practices and use of Tasers. Mr. Padilla also voluntarily dropped related claims at the pleading stage, such as those for false arrest and municipal liability. Those decisions successfully avoided any motion for summary judgment on the part of the City and limited the trial and appeal to a single claim, substantially reducing the cost to arrive at this point.

The defendants mounted a vigorous defense and fought successfully to have the verdict set aside on post-trial motions.  On appeal, the parties filed lengthy briefs canvassing the law across all jurisdictions at a high level of particularity, and the defendants advanced new factual and legal bases to defend the decision.  The plaintiff's appeal included oral argument preparations, including moots and an oral argument that was longer that the scheduled time. Counsel excluded the time expended by law students and paralegals, although it is compensable. At every stage of the case, the plaintiff made efforts to settle and avoid further litigation, but the defendants declined to consider such a resolution.

The plaintiff contends that an upward adjustment is appropriate in the circumstance of this case based on the following factors the: (i) degree of success, which surpassed the defendants' assessment when they rejected the plaintiff's offer to settle the case for $20,000 before suit; (ii) unattractive nature of the case involving the allegation of a constitutional violation by a convicted felon against police officers during the lawful arrest for a drug crime; and (iii) unnecessary use of force by law enforcement and the issue of qualified immunity are a focal point in addressing systemic racism in policing and use of excessive force, and counsel undertook representation despite the absence of any severe and permanent injury.  The plaintiff seeks costs for filing fees, process server fees, deposition fees, deposition transcripts, printing costs and train and lodging for oral argument for Ali.  According to the plaintiff, he is entitled to

fees for the time spent on this motion and any more post-judgment motions.  In support of the

motion, the plaintiff submitted declarations by: (a) Padilla with Exhibit A ("containing my hours

and costs related to this case") and Exhibit B ("receipts for costs"); (b) Zelman with Exhibit A

("detailed billing records"); (c) Ali with Exhibit A (Ali's time entries), Exhibit B (time entries

for Schmutzer and Ram), Exhibit C (cost invoices) and Exhibit D ("the City's email exchange

with the mediator"); and (d) Heath Gershengorn ("Gershengorn"), a partner and chair of the

Appellate and Supreme Court Practice at Jenner & Block LLP.[1]

### DEFENDANT'S CONTENTIONS

The defendant argues that the plaintiff's: (1) "counsel's proposed hourly rates are

unreasonably high"; (2) "counsel's claimed hours are unreasonable"; and (3) "recovery of costs

should be reduced to reflect plaintiff's limited success."  The plaintiff seeks fess as follows:

| Attorney | Hours | Rate | Amount |
|---|---|---|---|
| Alexis G. Padilla | 312 | $500 | $156,000 |
| David Zelman | 104.5 | $600 | $62,700 |
| Amir H. Ali | 302.2 | $525 | $158,665[2] |
| David Schmutzer | 36.1 | $150 | $5,415 |
| Meghan Ram | 27.1 | $250 | $6,775 |
| Total Attorney Charges: | | | $389,555[3] |

According to the defendant, "the prevailing rates awarded to solo practitioners like Mr. Zelman

and Mr. Padilla should be commensurate with the legal community for small firms or solo

---

[1] Declarations by Zelman, Ali and Gershengorn do not comply with 28 U.S.C. § 1746.

[2] The plaintiff's table contains an error because 302.2 multiplied by 525 results in 158,655, not $158,665.

[3] As a result of the error in the amount shown for Ali, the total amount is erroneous.  The correct total amount is $389,545, not $389,555.

practitioners, characterized by few employees and minimal overhead." The defendant maintains that "in the Southern District, prevailing rates tend to range from \$250 to \$600, with rates for associates ranging from \$250 - \$350" and "[t]he appropriate hourly rate for paralegals for a case of this nature in this district is \$100, which is the rate that has been awarded even to mid-size and large corporate law firms." The most critical factor in assessing attorney's fees is the degree of success obtained compared to what was sought in the litigation, and the plaintiff sued four members of the New York City Police Department, seeking substantial compensatory and punitive damages, but failed to obtain compensatory damages. Based on the limited success, an across-the-board reduction of thirty percent should apply to the plaintiff's award of fees and costs.

The defendant contends that hourly rates requested "bear no relationship to the skill level displayed or needed for this straightforward action, nor are they commensurate with counsels' varied levels of experience." According to the defendant:

> Mr. Padilla commenced this action and served as trial counsel. He avers that he has been admitted to the New York State bar since 2013 and has "litigated to completion" over 50 civil rights cases in this district and in the Eastern District of New York. Mr. Padilla represents that he has completed twelve trials, including five federal civil rights matters. This level of experience does not merit an hourly rate of \$500. Just months ago, Mr. Padilla was awarded an hourly rate of \$200 in the Eastern District of New York. Murray v. Marshall, No. 15-CV-599 (RPK) (PK), 2020 U.S. Dist. LEXIS 119857, at *3-4 (E.D.N.Y. July 8, 2020). In that action, Mr. Padilla had also paired with Mr. Zelman on behalf of plaintiff. Mr. Padilla sought an hourly rate of \$300. Judge Kuo, in making a report and recommendation on plaintiff's fee application, considered Mr. Padilla's representation that he had handled more than 30 civil rights cases and had been litigating in the Eastern and Southern Districts since 2014. In light of his experience, Judge Kuo found that Mr. Padilla was not entitled to \$300 an hour and that \$200 was appropriate. . . . While the Eastern District rates are slightly less than those awarded in the Southern District, the measured consideration by Judge Kuo and Judge Kovner is instructive here. Mr. Padilla is a skilled attorney with growing experience in federal civil litigation. Defendant does not discredit that. However, that is insufficient to justify top-tier rates. The litigation of this case prior to trial was unusually straightforward. The parties conducted limited document discovery,

five party depositions, engaged in no substantive motion practice, and reached agreement on most in limine matters.  Trial too, was relatively straightforward. Only plaintiff and the four defendant officers were examined.  According to his declaration, Mr. Padilla has completed five civil trials, including this one.  That he is relatively inexperienced in the practice was evident in some ways. For example, Mr. Padilla's improper conduct during summation is currently a basis of defendant's motion for new trial.  During trial, the Court needed to explain to Mr. Padilla some facets of federal civil litigation that an attorney worthy of the $500 rate that Mr. Padilla is seeking would likely know.  For example, after Mr. Padilla attempted to elicit his own client's prior statements to bolster his trial testimony, the Court explained that hearsay evidence cannot be used in that manner.  Similarly, defense counsel and the Court had to inform Mr. Padilla that he was quite close to waiving attorney client privilege during plaintiff's direct examination.  (See Trial Transcript at 124:2-25).  In light of his role and limited but growing experience in federal civil rights litigation, and in keeping with the recent analysis of his fee application in the Eastern District of New York, Murray, 2020 U.S. Dist. LEXIS 119857, at *3, an hourly rate of no more than $250 would be appropriate in this matter.

The defendant asserts that Zelman's hourly rate of $600 and nearly one third of primary counsel's hours are surprising given his "limited and largely invisible role."  Although Zelman was awarded $450 hourly rate, not $500 he sought, in one instance in this district, that rate "represented a substantial increase over Mr. Zelman's previously awarded rates, due in part to the nature of the litigation, which involved two trials and an appeal."  Similarly, courts in the Eastern District of New York awarded Zelman $350, not $500 or $450 that he sought, despite Zelman's spending 14 years of his career focused on police misconduct cases and handling more than one hundred cases, including five that he tried or helped try to verdict in federal court.  The defendant asserts that "nothing about Mr. Zelman's experience or the nature of work required in the post-trial motion phase of this litigation warrants an exceptionally high fee award."

Concerning Ali's request for an hourly rate of $525, the defendant maintains it is unreasonably high.

Mr. Ali has built a laudable resume since graduating from law school nine years ago, and his practice is focused on federal appellate litigation.  Mr. Ali reports that

he works for a well-respected institute and is one of five full time employees in the Supreme Court and Appellate Program. As such, his organization does not have the massive overhead costs that often justify extremely high rates for large law firms. It was in Mr. Ali's interest to litigate qualified immunity and the case, no doubt produced reputational benefits.  Indeed, Mr. Ali sought out plaintiff's attorneys to get involved in this action and, during the course of his representation, drew the attention of organizations such as the Cato Institute. These factors weigh against granting a fee award as high as the top-tier rates that Mr. Ali seeks. . . . The rate now sought by Mr. Ali is considerably more than has often been awarded to civil rights attorneys with many more years of relevant experience. See e.g. Dancy v. McGinley, No. 11-CV-7952 (LMS), 2015 U.S. Dist. LEXIS 150366 (S.D.N.Y. Sept. 21, 2015) ($400 per hour for experienced civil rights attorney with more than two decades of experience); Agyapong v. Bohan, No. 11-CV-586 (VB), 2013 U.S. Dist. LEXIS 56464 (S.D.N.Y. Apr. 9, 2013) ($400 per hour for attorney who has been practicing law since 1980 and litigated 400 civil rights cases); Lee v. Santiago, No. 12CV-2558 (PAE) (DF), 2013 U.S. Dist. LEXIS 130141, *12 (S.D.N.Y. Aug. 15, 2013) ($350 per hour for attorney claiming 20 years' experience in civil rights, with eight years of significant experience in civil rights); Access 4 All, Inc. v. Park Lane Hotel, Inc., No. 04-CV07174 (SAS) (JCF), 2005 U.S. Dist. LEXIS 34159 (S.D.N.Y. 2005) ($350 per hour to attorneys with 20 years of experience); Handschu v. Special Servs. Div., 727 F. Supp. 2d 239, 243 & 246 (S.D.N.Y. 2010) ($400 for five attorneys admitted to the bar in the 1960s and 1970s, "active in one way or another during their careers in civil rights litigation," including the Legal Director of the NYCLU); Adams v. New York State Educ. Dep't, 630 F. Supp. 2d 333, 349-350 (S.D.N.Y. 2009) ($350 per hour for attorney with 21 years of relevant experience); Trs. of the Mason Tenders Dist. Council Welfare Fund, Pension Fund, Annuity Fund & Training Program Fund v. Stevenson Contracting Corp., 05-CV-5546, 2008 U.S. Dist. LEXIS 108690 (S.D.N.Y. June 19, 2008) ($325 per hour and $ 350 per hour for a large firm associates with more than twenty-four years of general litigation experience and fifteen years of subject-matter experience), report & rec. adopted, 2008 U.S. Dist. LEXIS 58018, (S.D.N.Y. July 29, 2008). There is no reason to conclude that, in this case, Mr. Ali should be compensated in the highest tier of awarded rates.  This does not diminish the importance of fee shifting statutes.  It simply recognizes historical awards in this jurisdiction. . . . Recognizing his substantial experience but mindful that he has been practicing for less than a decade as compared with those who attain the highest fee awards, defendant submits that a reasonable hourly rate is $400.  While this proposed rate is quite high, defendant proposes it, in part, in light of the nature of the appellate work performed in this case.

The defendant asserts that Schmutzer and Ram did not demonstrate that they are entitled to the

hourly rates they seek, $150 and $250 respectively.  The case did not present unique challenges

and complexity; rather, it involved a typical and uncomplicated set of issues, and its simplicity is

prevalent on the face of the complaint.  Although the plaintiff claims that the case was

undesirable, the reason was that his factual allegations were difficult to believe.  Thus, his

counsel made a strategic decision to streamline the claims to excessive force prior to trial.  The

plaintiff's counsel "acknowledge that they work on contingency and do not affirm that any

paying clients have actually tendered the hourly rates that they now seek."  Moreover, "counsel

have offered no evidence that their role as counsel in this action otherwise precluded them from

employment.  To the contrary, it appears that they remained engaged in other substantial matters

during the pendency of this action."  The defendant argues that reduction to an hourly rate no

more than $400 for Ali, $350 for Zelman, $250 for Padilla and $125 for Schmutzer and Ram are

warranted.

The defendant argues that hours requested are unreasonable and the Court should reject

the argument that each counsel seeking fees

> is of such exceptional caliber that he or she falls within the top tier of the prevailing
> rates for his or her respective positions yet, on the other hand, each attorney needed
> to devote substantial hours to this litigation.  If, as plaintiff's team declares, each
> member brought an exceptional level of skill to this action, then efficiency should
> have been a natural consequence.

As it concerns Padilla's 312 hours, his time sheets seem to reflect that pretrial activities were

conducted in an efficient manner.  However, certain instances of unreasonable billing include:

(1) ".3 hours mailing initial disclosures on February 21, 2017"; (2) "2 hours drafting the

Amended Complaint on May 25, 2017, when that pleading simply replaced Doe defendants with

the named defendants and omitted previously alleged highly dubious factual contentions about

plaintiff's alleged uncle"; (3) "another hour drafting the Second Amended Complaint on July 27,

2020, when that pleading simply named Undercover Officer #349 as a defendant"; (4) "7.5 hours

on proposed voir dire questions"; (5) from May 24, 2018 onward "plaintiff's counsel's entries

are unreasonable," as they involve mostly communications with Zelman, allegedly experienced

and capable counsel, and constitute double billing"; and (6) "vague entries regarding the

appellate phase of the case, from November 21, 2018 to the present."  The defendant asserts that

reducing Padilla's hours by 51 is warranted, leaving 261 compensable hours.

The defendant contends that Zelman's 104.5 hours are most unreasonable because he

appeared briefly in the case to oppose the defendants' post-trial motions and, when he failed, Ali

joined the team as appellate counsel.

> No reasonable client would agree to compensate for the hours spent by Mr. Zelman
> acting as an "observer" during trial nor would a reasonable client pay for Mr.
> Zelman to simply stay apprised of the issues being addressed on appeal. See
> Thomas v. City of N.Y., No. 1:09-cv-3162 (ALC), 2017 U.S. Dist. LEXIS 232964,
> at *4 (S.D.N.Y. Dec. 15, 2017) (reducing Mr. Zelman's claimed hours from 59 to
> 8.6 because "under the facts of this case, no client would be willing to pay trial
> counsel for 59 hours of work on an appeal, when appellate counsel was retained to
> work on the appeal.").  In this case, a reasonable client would only be willing to
> compensate Mr. Zelman at a reasonable rate for his limited role in helping to oppose
> defendants' initial post-trial motion.  For these tasks, however, from a period
> spanning from May 24, 2018, until November 21, 2018, plaintiff's counsel seeks
> compensation for 53.5 hours.  This is unreasonable on its face, so it is not surprising
> that plaintiff's time entries for the alleged basis for this claim are extremely vague.
> Under the circumstances, this portion of plaintiff's counsel's claimed fees should
> be subject to a substantial across the board reduction of at least 50 percent (for a
> maximum of 26.75 hours).  The remainder of Mr. Zelman's claimed hours should
> be rejected as unreasonable.

The defendant asserts that Ali's 302.2 hours are unreasonable despite his successful

advocating for his legal position.

> While qualified immunity is a developing legal issue, Mr. Ali is, by his own
> account, well versed in qualified immunity jurisprudence.  Indeed the legal subject
> matter was a reason for getting involved in this litigation.  By way of comparison,
> the Honorable Denise L. Cote recently determined that a single lawyer seeking fees
> for a § 1983 excessive force action that was litigated with discovery disputes and
> motion practice, proceeded to trial, resulted in judgment as a matter of law for
> defendants after post-trial motions based on, among other grounds, qualified
> immunity,  and was successfully appealed by plaintiff, could reasonably be
> expected to spend " conservatively about 280 hours on this litigation, and

generously about 340 hours." <u>Ortiz v. City of N.Y.</u>, No. 15-CV-2206 (DLC), 2020
U.S. Dist. LEXIS 26241, at *18 (S.D.N.Y. Feb. 14, 2020).

Accordingly, the defendant contends that a 40 percent reduction is appropriate, resulting in 181.2

compensable hours for Ali.  For the same reasons, hours expended by Ali's law clerks are

redundant and excessive, warranting an across-the-board reduction of 40 percent, resulting in

37.86 compensable hours for both Schmutzer and Ram.

The defendant concedes that the categories for which the plaintiff seeks costs are

appropriate.  However, considering the plaintiff's limited success, a 30 percent reduction is

appropriate, for an award of $2,791.63 in costs.  The defendant argues that the total fee award

should not exceed $106,272.25 and costs should not exceed $2,791.63.

**PLAINTIFF'S REPLY**

The plaintiff asserts that the defendant does not contest that over four years it refused to

consider settlement offers in favor of litigation or that the plaintiff received a verdict that

exceeded his pretrial settlement offer and a finding that an officer acted maliciously and

wantonly.  The defendant ignores the plaintiff's authorities and "resorts to 10-to-15-year-old

and out-of-district cases.  As to time expended, the City does not identify a single unnecessary

litigation decision and ultimately disputes 20.7 hours of billing records."  The defendant does not

allege any typical basis for downward adjustment, such as systematic block or duplicative

billing, but argues that the plaintiff received "25 cents" in compensatory damages and prevailed

only as to a single officer, without citing to any authority.  The plaintiff cited a 2015 decision

surveying this district's caselaw and finding the top-end rate for civil rights attorneys was $650.

Although rates increase over time, the requested rates are below the high-end five years ago.

Without addressing Mr. Jones's authorities, the City says the high-end is $600,
citing *Alicea v. City of New York*, 272 F. Supp. 3d 603 (S.D.N.Y. 2017), and some
nearly decade-old cases. Fee-Opp. 4-5. This is misleading. *Alicea* merely

13

recognized $600 was the high end "as of 2010," while noting "$650 [is] reasonable for civil rights litigator[s] in light of 'skill and experience.'" 272 F. Supp. 3d at 609. And this Court recognized that "rates of $600 and $550 [were] reasonable for lawyers with over a decade of experience," id. —a benchmark that makes Mr. Jones's proposals modest.

The defendant does not address the factors for determining the appropriate rate and it does not

dispute the lengthy proceedings, corresponding investment of labor and fee structure, which all

support a high rate. The defendant also

does not attempt to reconcile its position with *Lilly v. City of N.Y.*, 934 F.3d 222 (2d Cir. 2019). There, the Court of Appeals found "no error" where the district court began with $650 for experienced civil-rights attorneys and reduced to $450 based on "the 'duration and simplicity.'" *Id.* at 226-27, 231. The City does not dispute that the Court's analysis, reducing the rate because the case "'lasted less than 10 months, required no depositions, and involved no substantial motions or briefings' or appearances before the district court," *id.* at 232, supports Mr. Jones here. This case lasted four years, required depositions by both parties, involved a full trial, post-trial motions, a complex appeal, and post-appeal litigation.

The defendant's assertion that this case was typical and uncomplicated without any explanation

based on the record and citation to cases in which courts recognize that excessive force cases can

be relatively straightforward are not sufficient to show that this case, implicating complex legal

issues and standards, was simple.  The appeal in this case confirms the complexity of the case.

Concerning hourly rates, the plaintiff contends:

*Alexis G. Padilla.* The City acknowledges Mr. Padilla "is a skilled attorney" with eight years' experience. Fee-Opp. 8. Mr. Padilla accordingly proposed $500, less than typical for attorneys with a decade of experience. *See supra*. The City points to a recent Eastern District award for $200, Fee-Opp. 7-8, but that supports Mr. Padilla's request. First, the Court of Appeals has recognized that Eastern District rates are "substantially lower" than this district, *Simmons v. New York City Transit Auth.*, 575 F.3d 170, 172 (2d Cir. 2009). The upper limit there is $350 to $400—a 50% to 60% discount. *AdvantEdge Corp. v. Krajicek*, No. 16CV1643WFKRML, 2017 WL 7411018, at *3 (E.D.N.Y. Oct. 2, 2017). Second, the Eastern District rate assumed Mr. Padilla "handl[ed] more than 30 civil rights cases." *Murray v. Marshall*, No. 15-CV-599(RPK)(PK), 2020 WL 5899851, at *3 (E.D.N.Y. Mar. 16, 2020). The record here reflects Mr. Padilla has nearly twice that experience: over 50 civil rights cases, plus two dozen pending. Padilla Decl. ¶¶ 29, 31.

14

*David Zelman.* The City does not dispute Mr. Zelman has litigated 250 police misconduct cases over 20 years. Fee-App. 13. Mr. Zelman accordingly proposed $600, still below the high-end. Relying on out-of-district cases, the City says Mr. Zelman's rate is $350—less than the $450 he was awarded in this district almost five years ago. *See Thomas v. City of New York*, No. 1:09CV-3162 (ALC), 2016 WL 319982, at *7 (S.D.N.Y. Jan. 26, 2016). This Court confronted a similar circumstance in *Rozell v. Ross-Holst*, 576 F. Supp. 2d 527 (S.D.N.Y. 2008). There, counsel had received rates between $400 and $500 about four years earlier. The Court nonetheless awarded $600, explaining that "[t]he rates previously awarded should not necessarily be considered a cap" because "rates charged by attorneys have generally increased." Id. at 546.

*Amir H. Ali.* The City acknowledges that Mr. Ali has "substantial" and "laudable" experience based on his record of success in civil rights cases before federal appeals courts and the U.S. Supreme Court. Fee-Opp. 10; Gershengorn Decl. ¶ 10; Ali Decl. ¶¶ 5-9. It also acknowledges that "the nature of the appellate work performed" necessitates a "quite high" rate. Fee-Opp. 12. Mr. Ali proposed $525, less than is typically awarded to Director-level attorneys or to attorneys with ten years' experience even without his accomplishments. Fee-App. 14-16; Gershengorn Decl. ¶ 10. The City asks for $400, but does not ground that request on any relevant factor or anything in the record. It offers an unsubstantiated assurance that Mr. Ali "no doubt" received "reputational benefits." Fee-Opp. 10. But such claims require actual evidence, such that an attorney "actively did leverage [the case] to obtain business" and "actively sought" and received "widespread media coverage." *Schoolcraft v. City of New York*, No. 10 CIV. 6005, 2016 WL 4626568, at *7 (S.D.N.Y. Sept. 6, 2016). Here, the unrebutted evidence shows Mr. Ali works for a nonprofit (a far cry from leveraging for business) and is routinely retained to litigate far higher profile appeals. Ali Decl. ¶¶ 8-9.

*Megha [sic] Ram & David Schmutzer.* Mr. Jones cited authority establishing $200 to $350 for associates. He requested only $150 for Mr. Schmutzer, a law clerk and then first-year associate, and $250 for Ms. Ram, a second-year associate. The City cites decade-old cases to suggest a $125 to $200 range and simply asserts they "should not be compensated more than $125." Fee-Opp. 1213. This is unsound. Over a decade ago, this Court found "ample support" to award $150 to paralegals. *Hnot v. Willis Grp. Holdings Ltd.*, No. 01 CIV. 6558, 2008 WL 1166309, at *3 (S.D.N.Y. Apr. 7, 2008). Mr. Jones's proposal is in line with, and indeed less than, amounts awarded to law clerks and junior attorneys. *E.g.*, *Rozell*, 576 F. Supp. 2d at 546 (awarding $250 for junior associates and $175 to law clerks).

The plaintiff asserts that the defendant does not allege any unnecessary litigation and the majority of the defendant's assertions of unreasonable hours are made without identifying any time records that are excessive in light of the litigated issues.  The defendant concedes that Padilla's pre-trial and trial work was efficient but challenges his 10.8 hours, which is superficial

because "determining whether to amend (or not amend) a complaint, and how to craft voir dire questions, entails research and careful analysis, which reasonably takes some time." As it concerns the defendant's challenge to Padilla's hours after May 24, 2018, only 9.9 hours are communications with Zelman and the rest of hours describe "a telephonic hearing, research, reviewing briefing and court decisions, and communications with the client, opposing counsel, or appellate counsel." Courts award routinely fees for second-chairs or teams and the plaintiff only had one counsel at any given time, with communications as needed to serve the plaintiff. The defendant asserts that Zelman's time as an "observer" during trial should be excluded but failed to explain what that means since none of Zelman's entries are for observing trial. Zelman's review of trial transcripts was necessary to oppose the defendants' post-trial motion, and the defendant made no citation to any authority to support the assertion that 53.5 hours to oppose a post-trial motion, which threatened the plaintiff's jury verdict, is too high. The defendant failed to identify any time entries in Ali's appeal or post-trial work that are unreasonable and to rebut Gershengorn's and Ali's declarations describing the complexity of the several legal issues, particularized research across jurisdictions and post-trial appeal. The defendant does not dispute that Ali's time expended on appeal and post-trial litigation is less than previously compensated time.

The plaintiff asserts that the defendant's arguments for downward adjustment contravene the binding precedent, in which the Second Circuit holds that a lodestar "should not be reduced simply because a plaintiff recovered a low damage award." *Cowan v. Prudential Ins. Co. of Am.*, 935 F.2d 522, 526 (2d Cir. 1991) (emphasis added)." The plaintiff testified he pursued this case to "bring light" to the unnecessary escalation of force, not for compensation, which does not make him less worthy of fees under § 1988. The plaintiff proceeded to trial on a single legal

theory, excessive force arising from a single encounter involving all officers and the defendant does not argue that the claims in this action were wholly unrelated.  The plaintiff demonstrated by record-based reasons that an upward adjustment is warranted and the defendant's assertion that the plaintiff's allegations were "difficult to believe" only support the fact that this case arose on "undesirable" facts.  Since the defendants declined to settle the matter for $20,000 and made no offer of judgment, the jury vindicated the plaintiff's constitutional rights, awarding $30,000 and finding malicious and wanton conduct.  The defendant

> does not dispute that such adjustment is necessary if § 1988 is to safeguard "meritorious civil rights claims which might otherwise be abandoned." *Farbotko v. Clinton Cty. of New York*, 433 F.3d 204, 208 (2d Cir. 2005). We face a national reckoning on race, policing, and force. As General Gershengorn attests: "It is critical to the accountability of government and the vindication of civil rights that cases and appeals of this nature be zealously litigated even when other financial incentives, such as a large damage award, are not present." Gershengorn Decl. ¶ 11.

The defendant's request for a reduction of the costs should be denied because the defendant relies on a case that reduced costs partially for computerized research where the plaintiffs failed on most of their claims; the plaintiff does not seek costs for computerized research and the defendant does not allege that costs were excessive.  The plaintiff submitted supplemental time records concerning the instant fee application, seeking: (1) $19,950 for 39.9 hours by Padilla at his $500 hourly rate; (2) $9,000 for 15 hours by Zelman at his $600 hourly rate; and (3) $10,972 for 20.9 hours by Ali at his $525 hourly rate.

## LEGAL STANDARD

> In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318, the Religious Freedom Restoration Act of 1993, the Religious Land Use and Institutionalized Persons Act of 2000, title VI of the Civil Rights Act of 1964, or section 12361 of Title 34, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs[.]

42 U.S.C § 1988(b).

Section 1988 was enacted to insure that private citizens have a meaningful opportunity to vindicate their rights protected by the Civil Rights Acts. *Hensley v. Eckerhart,* 461 U.S., at 429, 103 S.Ct., at 1937. See S.Rep. No. 94–1011, p. 2 (1976). "The effective enforcement of Federal civil rights statutes depends largely on the efforts of private citizens," and unless reasonable attorney's fees could be awarded for bringing these actions, Congress found that many legitimate claims would not be redressed. H.R.Rep. No. 94–1558, p. 1 (1976) H.R.Rep. No. 94–1558, p. 1 (1976).

Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 559–60, 106 S. Ct. 3088, 3095 (1986), supplemented, 483 U.S. 711, 107 S. Ct. 3078, 97 L. Ed. 2d 585 (1987).

### *Prevailing Party*

When a plaintiff succeeds in remedying a civil rights violation, we have stated, he serves "as a 'private attorney general,' vindicating a policy that Congress considered of the highest priority." *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968) *(per curiam).* He therefore "should ordinarily recover an attorney's fee" from the defendant—the party whose misconduct created the need for legal action. *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 416, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978) (internal quotation marks omitted). Fee-shifting in such a case at once reimburses a plaintiff for "what it cos[t] [him] to vindicate [civil] rights," *Riverside v. Rivera,* 477 U.S. 561, 577–578, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) (internal quotation marks omitted), and holds to account "a violator of federal law," *Christiansburg,* 434 U.S., at 418, 98 S.Ct. 694. . . . [W]e have made clear that plaintiffs may receive fees under § 1988 even if they are not victorious on every claim. A civil rights plaintiff who obtains meaningful relief has corrected a violation of federal law and, in so doing, has vindicated Congress's statutory purposes. That "result is what matters," we explained in *Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983): A court should compensate the plaintiff for the time his attorney reasonably spent in achieving the favorable outcome, even if "the plaintiff failed to prevail on every contention." *Ibid.* The fee award, of course, should not reimburse the plaintiff for work performed on claims that bore no relation to the grant of relief: Such work "cannot be deemed to have been expended in pursuit of the ultimate result achieved." *Ibid.* (internal quotation marks omitted). But the presence of these unsuccessful claims does not immunize a defendant against paying for the attorney's fees that the plaintiff reasonably incurred in remedying a breach of his civil rights.

Fox v. Vice, 563 U.S. 826, 833-34, 131 S. Ct. 2205, 2213-14 (2011).

The Supreme Court "explained that when a plaintiff secures an 'enforceable judgmen[t] on the merits' or a 'court-ordered consent decre[e],' that plaintiff is the prevailing party because he has received a 'judicially sanctioned change in the legal relationship of the parties.'" CRST Van Expedited, Inc. v. E.E.O.C., 136 S. Ct. 1642, 1646 (2016) (quoting Buckhannon Bd. & Care Home, Inc. v. W. Va Dep't of Health & Human Res., 532 U.S.598, 604-05, 121 S. Ct. 1835, 1840 (2001)).

### Reasonable Attorney's Fees

> Our cases interpreting § 1988 establish "[a] strong presumption that the lodestar figure—the product of reasonable hours times a reasonable rate—represents a 'reasonable' fee." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). To be sure, before the lodestar became "the guiding light of our fee shifting jurisprudence," *Burlington v. Dague,* 505 U.S. 557, 562, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), many lower courts used one of your classic 12–factor balancing tests. *See Delaware Valley,* 478 U.S., at 562, and n. 7, 106 S.Ct. 3088. Ultimately, though, this Court rejected undue reliance on the 12–factor test because it "gave very little actual guidance to district courts [,] ... placed unlimited discretion in trial judges[,] and produced disparate results." *Id.,* at 563, 106 S.Ct. 3088.
>
> Murphy v. Smith, 138 S. Ct. 784, 789–90 (2018).

A strong presumption that the lodestar figure—the product of reasonable hours times a reasonable rate—represents a "reasonable" fee is wholly consistent with the rationale behind the usual fee-shifting statute, including the one in the present case. These statutes were not designed as a form of economic relief to improve the financial lot of attorneys, nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client. Instead, the aim of such statutes was to enable private parties to obtain legal help in seeking redress for injuries resulting from the actual or threatened violation of specific federal laws. Hence, if plaintiffs, such as Delaware Valley, find it possible to engage a lawyer based on the statutory assurance that he will be paid a "reasonable fee," the purpose behind the fee-shifting statute has been satisfied. Moreover, when an attorney first accepts a case and agrees to represent the client, he obligates himself to perform to the best of his ability and to produce the best possible results commensurate with his skill and his client's interests. Calculating the fee award in a manner that accounts for these factors, either in determining the reasonable number of hours expended on the litigation or in setting the reasonable hourly rate, thus adequately compensates the attorney, and leaves very little room for enhancing

the award based on his post-engagement performance. In short, the lodestar figure includes most, if not all, of the relevant factors constituting a "reasonable" attorney's fee, and it is unnecessary to enhance the fee for superior performance in order to serve the statutory purpose of enabling plaintiffs to secure legal assistance.

Delaware Valley Citizens' Council for Clean Air, 478 U.S. at 565–66, 106 S. Ct. at 3098.

Although the lodestar method is not perfect, it has several important virtues. First, in accordance with our understanding of the aim of fee-shifting statutes, the lodestar looks to "the prevailing market rates in the relevant community." *Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). Developed after the practice of hourly billing had become widespread, *see Gisbrecht, supra,* at 801, 122 S.Ct. 1817, the lodestar method produces an award that *roughly* approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case. Second, the lodestar method is readily administrable, *see Dague,* 505 U.S., at 566, 112 S.Ct. 2638; see also *Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources,* 532 U.S. 598, 609, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001); and unlike the *Johnson* approach, the lodestar calculation is "objective," *Hensley, supra,* at 433, 103 S.Ct. 1933, and thus cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results.

Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 551–52, 130 S. Ct. 1662, 1672 (2010).

The Supreme Court's "decisions concerning the federal fee-shifting statutes have established six important rules": (1) "a 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case"; (2) "the lodestar method yields a fee that is presumptively sufficient to achieve this objective"; (3) "enhancements may be awarded in 'rare' and 'exceptional' circumstances"; (4) "the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee," and "an enhancement may not be awarded based on a factor that is subsumed in the lodestar calculation," such as (i) "novelty and complexity of a case," which is generally presumed to be "fully reflected in the number of billable hours recoded by counsel," and (ii) "quality of an attorney's performance,"

which is "normally reflected in the reasonable hourly rate"; (5) "the burden of proving that an

enhancement is necessary must be borne by the fee applicant"; and (6) "a fee applicant seeking

an enhancement must produce "specific evidence" that supports the award."  Id. at 552-53, 130

S. Ct. at 1672-73.

>The Second Circuit Court of Appeals explained:

> [T]he district court, in exercising its considerable discretion, [should] bear in mind *all* of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate. The reasonable hourly rate is the rate a paying client would be willing to pay. In determining what rate a paying client would be willing to pay, the district court should consider, among others, the *Johnson* factors; it should also bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively. The district court should also consider that such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case. The district court should then use that reasonable hourly rate to calculate what can properly be termed the "presumptively reasonable fee."

> Lilly v. City of New York, 934 F.3d 222, 230 (2d Cir. 2019) (quoting Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 522 F.3d 182, 190 (2d Cir. 2008)).

In calculating the presumptively reasonable fee, a district court considers, among others, the

twelve factors articulated in Johnson v. Ga. Highway Express, Inc., 488 F.2d 714 (5th Circ.

1974). See Arbor Hill, 522 F.3d at 190.  Those factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

> Id. at 186-87 n.3.

The Second Circuit Court of Appeals stated that "*Perdue* confirmed the long-standing approach to calculating attorney's fees endorsed by the Supreme Court in *Hensley*, *Blum*, *Delaware Valley*, as well as our circuit in *Arbor Hill*." Lilly, 934 F.3d at 231.

> When a plaintiff's attorney achieves results that are more favorable than would have been predicted based on the governing law and the available evidence, the outcome may be attributable to superior performance and commitment of resources by plaintiff's counsel. Or the outcome may result from inferior performance by defense counsel, unanticipated defense concessions, unexpectedly favorable rulings by the court, an unexpectedly sympathetic jury, or simple luck. Since none of these latter causes can justify an enhanced award, superior results are relevant only to the extent it can be shown that they are the result of superior attorney performance. Thus, we need only consider whether superior attorney performance can justify an enhancement. And in light of the principles derived from our prior cases, we inquire whether there are circumstances in which superior attorney performance is not adequately taken into account in the lodestar calculation. We conclude that there are a few such circumstances but that these circumstances are indeed "rare" and "exceptional," and require specific evidence that the lodestar fee would not have been "adequate to attract competent counsel." First, an enhancement may be appropriate where the method used in determining the hourly rate employed in the lodestar calculation does not adequately measure the attorney's true market value, as demonstrated in part during the litigation. This may occur if the hourly rate is determined by a formula that takes into account only a single factor (such as years since admission to the bar) or perhaps only a few similar factors. In such a case, an enhancement may be appropriate so that an attorney is compensated at the rate that the attorney would receive in cases not governed by the federal fee-shifting statutes. But in order to provide a calculation that is objective and reviewable, the trial judge should adjust the attorney's hourly rate in accordance with specific proof linking the attorney's ability to a prevailing market rate. Second, an enhancement may be appropriate if the attorney's performance includes an extraordinary outlay of expenses and the litigation is exceptionally protracted. As Judge Carnes noted below, when an attorney agrees to represent a civil rights plaintiff who cannot afford to pay the attorney, the attorney presumably understands that no reimbursement is likely to be received until the successful resolution of the case, and therefore enhancements to compensate for delay in reimbursement for expenses must be reserved for unusual cases. In such exceptional cases, however, an enhancement may be allowed, but the amount of the enhancement must be calculated using a method that is reasonable, objective, and capable of being reviewed on appeal, such as by applying a standard rate of interest to the qualifying outlays of expenses. Third, there may be extraordinary circumstances in which an attorney's performance involves exceptional delay in the payment of fees. An attorney who expects to be compensated under § 1988 presumably understands that payment of fees will generally not come until the end of the case, if at all. Compensation for this delay is generally made "either by basing

22

the award on current rates or by adjusting the fee based on historical rates to reflect its present value." But we do not rule out the possibility that an enhancement may be appropriate where an attorney assumes these costs in the face of unanticipated delay, particularly where the delay is unjustifiably caused by the defense. In such a case, however, the enhancement should be calculated by applying a method similar to that described above in connection with exceptional delay in obtaining reimbursement for expenses. We reject the suggestion that it is appropriate to grant performance enhancements on the ground that departures from hourly billing are becoming more common.

Perdue, 559 U.S. at 554-56, 130 S. Ct. at 1674-75 (internal citations omitted).

## APPLICATION OF LEGAL STANDARD

### *Prevailing Party*

The defendant does not contest that the plaintiff is a prevailing party based on the judgment he obtained against Treubig. The Court finds that the plaintiff is a prevailing party under 42 U.S.C. § 1988(b) because he received a judicially sanctioned change in the legal relationship of the parties. See CRST Van Expedited, Inc., 136 S. Ct. at 1646.

### *Reasonable Attorney's Fees*

#### **Reasonable Hourly Rates**

The defendant acknowledges that: (1) the hourly rates requested, namely, $600 by Zelman, $525 by Ali, $500 by Padilla, $250 by Ram and $150 by Schmutzer, are within the rates prevailing in the Southern District of New York where this action was litigated because he asserts that "in the Southern District, prevailing rates tend to range from $250 to $600, with rates for associates ranging from $250 - $350"; and (2) the hourly rates in the Eastern District of New York are lower than those in the Southern District of New York because he asserts that "the Eastern District rates are slightly less than those awarded in the Southern District." However, when seeking a reduction of Zelman's hourly rate from $600 to $350 and Padilla's hourly rate from $500 to $250, the defendant relies erroneously on the cases from the Eastern District of

New York, not the forum applicable here.  The Second Circuit recognized that the prevailing hourly rates in the Southern District of New York are higher than those in the Eastern District of New York, even substantially higher.  See Simmons v. New York City Transit Auth., 575 F.3d 170, 177 (2d Cir. 2009) ("While Simmons cannot be faulted for wanting to retain counsel with the best possible reputation, it is not the TA's responsibility to compensate for such counsel based on higher out-of-district rates where Simmons has not shown that they were likely to produce a substantially better result than competent counsel in the Eastern District would produce for less—in this case, substantially less—money.").

Padilla

The defendant's assertion that Padilla's "level of experience does not merit an hourly rate of $500" because he was awarded recently $200 in the Eastern District of New York is rejected as meritless because the instant forum is the Southern District of New York where hourly rates are higher.  The defendant contends Padilla's rate should be reduced to $250 because this action was "straightforward" and completing five trials makes Padilla "relatively inexperienced," as evident from his conduct at trial, including when he "attempted to elicit his own client's prior testimony to bolster his trial testimony" and "the Court explained that hearsay evidence cannot be used in that manner."  The defendant does not make citation to any authority to support his proposition that Padilla's conduct at trial, including his attempt to introduce hearsay evidence, establishes Padilla's inexperience, rather than his litigation strategy.  To support his proposition that $250 is a reasonable hourly rate for Padilla, the defendant relies on Wright v. City of New York, 283 F. Supp. 3d 98, 104 (S.D.N.Y. 2017), in which the court stated that courts have reached consensus in this judicial district that the prevailing rate for civil rights attorneys with approximately ten years of experience is between $250 and $350, citing "*Adorno v. Port*

24

*Authority of New York & New Jersey,* 685 F.Supp.2d 507, 513–14 (S.D.N.Y. 2010) (finding that the range of fees in this District for civil rights and employment litigators with approximately ten years of experience is between $250 per hour and $350 per hour)."  The defendant's reliance on the rates found to be prevailing in this forum in 2010, is misplaced because this case commenced in 2016, and the plaintiff seeks fees for work that includes the instant fee application, filed in 2020; thus the 2010 hourly rates are historical.  See LeBlanc-Sternberg v. Fletcher, 143 F.3d 748, 764 (2d Cir. 1998) ("The lodestar should be based on 'prevailing market rates'; and current rates, rather than historical rates, should be applied in order to compensate for the delay in payment.") (citations omitted).  "The rates previously awarded should not necessarily be considered a cap, however, since the rates charged by attorneys have generally increased since [the 2003, 2004, 2006 and 2007] cases were decided, though it is unclear by what degree." Rozell v. Ross-Holst, 576 F. Supp. 2d 527, 546 (S.D.N.Y. 2008).  Moreover, the length of counsel's experience and the size of counsel's law firm are not the only factors courts consider in determining reasonable hurly rates.

In Wright, which commenced in February 2016 and concluded in June 2017 by the acceptance of an offer of judgment and which in 2017 relied on the 2010 prevailing rates, the court awarded $300, not $250 the lowest rate in the range, after considering "the previous approval of Counsel's rate at $300," "the totality of the circumstances surrounding Wright's claim and its resolution," and despite "Counsel's history of sanctionable conduct." Wright, 283 F. Supp.3d at 104.  Even in 2010, courts awarded hourly rates of $450 and $400 under Section 1988 to seasoned attorneys who are not experienced in civil rights litigation.  See Tatum v. City of New York, No. 06-CV-4290, 2010 WL 334975, at *5 (S.D.N.Y. Jan. 28, 2010).  In 2016, a court awarded, pursuant to Section 1988, a $550 hourly rate to civil rights attorneys with at least

a decade of experience and $450 to those with "slightly less" than a decade of experience, after

eight years of litigation and the Second Circuit affirmance of a jury verdict on appeal.  See

Bailey v. Pataki, No. 08-CV-8563, 2016 WL 3545941, at *6 (S.D.N.Y. June 16, 2016).  In 2019,

a court awarded a $400 hourly rate to a solo practitioner who was "'competent and seasoned' in

civil rights matters, especially involving Plaintiff and his years-long litigation" and faced a case

of "factual and historical complexity."  Medina v. Buther, No. 15-CV-1955, 2019 WL 4370239,

at *10-11 (S.D.N.Y. Sept. 12, 2019).

Padilla, who litigated to completion over fifty civil rights cases since he was admitted to

the New York bar in 2013, and tried twelve cases since 2015, of which five were civil rights

cases involving excessive force claims, has not been subject to sanctionable conduct and worked

on this case from its inception in October 2016 to October 14, 2020, including conducting pre-

trial discovery, making motions in limine, conducting a week-long trial and preparing post-

verdict interrogatories and making the instant motion.  As the Second Circuit noted at the

plaintiff's successful appeal, this case involved an issue of law, namely, qualified immunity

against the claim of excessive use of force, in particular the use of a taser on the plaintiff,

asserted at the close of the evidence and renewed after the jury verdict against Treubig.  See

Jones, 963 F.3d at 219.  However, the defendant did not assert qualified immunity until the close

of the evidence and renewed it after the jury verdict, at which point Padilla stated in his

declaration he contacted Zelman because he "was aware of his extensive experience with

litigating federal civil rights trials" and "Zelman advised me and provided citations to relevant

caselaw that I could use in my arguments before the Court concerning the substance of the post-

verdict interrogatories."  According to Padilla, following the post-verdict interrogatories, the

defendant moved for judgment as a matter of law on the ground that Treubig was entitled to

qualified immunity, at which point Zelman filed his notice of appearance "and formally came on to the case to take the lead in drafting and arguing plaintiff's opposition." Padilla does not assert, and his time records do not reflect that he performed any research or expended any hours on the qualified immunity issue prior to soliciting Zelman's aid in responding to the defendant's post-verdict motion for judgment as a matter of law. Even then, Padilla stated that Zelman provided him with citations to relevant caselaw, and his time records show "Reviewing relevant caselaw" on June 16, 2018, one day after the defendant's motion for judgment as a matter of law was made.

"Although the actual rate an attorney charges paying clients is persuasive evidence of reasonableness, compensable attorneys' fees must ultimately conform to market rates." Medina, 2019 WL 4370239, at *10. Padilla stated in his September 6, 2020 declaration that his "current practice is dedicated entirely to criminal defense and civil rights litigation" and he "currently represents plaintiffs in over two dozen pending civil rights matters in the federal courts and several others in the state courts." Padilla did not identify in his declaration the actual hourly rate that he charges his clients. In his November 2, 2020 reply, the plaintiff does not make citation to any recent case in this forum awarding a $500 hourly rate to an attorney with experience and skills comparable to Padilla's in a civil rights case such as this one.

In March 2021, a court considered a reduction of the hourly rate, in an employment discrimination case, "from $650 to $400" for Erica T. Healey-Kagan, recommended by a magistrate judge, finding that $400 was a reasonable hourly rate given her years of experience since graduating from law school in 2008 and "the nature of the suit." Sanson v. City of New York, No. 19 CIV. 2569, 2021 WL 1191566, at *3 (S.D.N.Y. Mar. 30, 2021). Another court considered, also in March 2021, hourly rates in a civil rights case as follows:

The Court first considers the hourly billing rates of the plaintiff's attorneys. The attorneys billed at hourly rates ranging from $275 to $500 an hour. Two partners of the law firm DePaola & Sim, LLP – John R. DePaola and Sang J. Sim – billed at hourly rates of $500, while a third partner, Samuel DePaola, billed at a $475 hourly rate. (Sim Dec. ¶¶ 6-8.) Two senior counsel, John Kouroupas and Markus A. Wilson, billed at hourly rates of $375. (Sim Dec. ¶¶ 9-10.) An associate, Weibo Zhang, billed at hourly rates of $275. (Pl. Mem. ¶ 35.) Two paralegals billed at hourly rates of $125. (Pl. Mem. ¶¶ 36-37.) While six attorneys of the firm billed time on this case, a substantial majority of time was billed by Sim and Samuel DePaola. . . . The Court has reviewed the background and experience of plaintiff's attorneys, as described in plaintiff's memorandum and reply. (Pl. Mem. 10-11; Reply 6-8.) John DePaola has practiced law since 1982, first working as an assistant district attorney in the Bronx from 1982 to 1986 before going into private practice and specializing in civil rights claims. Sang J. Sim has practiced law since 1996, and principally did corporate taxation work until 2003, when he began to practice in litigation, including civil rights claims. Samuel C. DePaola has practiced law since 2011 and worked as an assistant district attorney in King's County from 2011 to 2015, at which point he joined DePaola & Sim and has practiced civil rights law. John Kouroupas has practiced law since 2004 and worked for the Corporation Counsel of the City of New York until 2007, at which point he joined DePaola & Sim. It is not clear when Markus A. Wilson began his legal career, but he previously worked as an assistant district attorney in the Bronx, and joined DePaola & Sim in 2012. Plaintiff asserts that attorney Weibo Zhang has worked on more than 300 civil rights cases against the City, though she does not dispute that Zhang was admitted to practice in 2019. A district court opinion of Judge Ramos thoroughly reviewed the hourly rates in this district for attorneys who successfully prosecute civil rights claims, observing that they ranged from $250 to $650, varying with the size and complexity of the case. Lilly v. City of New York, 2017 WL 3493249, at *4-5 (S.D.N.Y. Aug. 15, 2017). Recognizing that some time has passed since the opinion of Judge Ramos, the Court is nevertheless persuaded by his detailed review of hourly rates in civil rights cases and uses it as a reference point. Id.; see also Jean-Louis v. City of New York, 342 F. Supp. 3d 436, 442 (S.D.N.Y. 2018) (courts generally award reasonable hourly fees of $350 to $450 for experienced civil rights attorneys in this District). Judge Ramos concluded that a $450 rate was appropriate for a case that lasted ten months and required no depositions or substantial motion practice. 2017 WL 3493249, at *4-5. The Second Circuit affirmed, noting that fee awards in "straightforward civil rights cases" in this District generally fell within the $350 to $450 range. Lilly v. City of New York, 934 F.3d 222, 231 (2d Cir. 2019). Having considered the experience of the attorneys, the range of fees commonly awarded in this district and all other case-specific variables, the Court concludes that the reasonable hourly rates for work in this case are $425 for John DePaola and Sim, $400 for Samuel DePaola, $350 for Kouroupas and Wilson and $275 for Zhang.

Hill v. City of New York, No. 19-CV-7882, 2021 WL 1062585, at *3–4 (S.D.N.Y. Mar. 18, 2021).

In a case involving a Fourth Amendment challenge to a regulation by a corporation, the court found in March 2021 the following hourly rates under Section 1988 reasonable based on comparable Fourth Amendment civil rights cases: $650 for Kristin Linsley, a partner at Gibson Dunn for nearly five years and at Munger, Tolles & Olsen LLP for 22 years before that, "in light of the unusually complex and sophisticated work" and her "substantial experience in the relevant area of law generally and with HomeAway specifically"; $600 for Mylan Denerstein, a partner at Gibson Dunn, for similar reasons as Linsley but reduced given her "lesser experience" in the particular area of law and type of challenge; $500 for Joshua Dick, a partner at Gibson Dunn, "[o]wing to his seniority and substantial experience in this area of law, the uncommonly complex nature of the constitutional issues presented in this civil rights action, and the rising tide of billing rates in this District—and in civil rights cases specifically"; $400 for Jacob Spenser, a senior associate at Gibson Dunn who graduated from law school in 2012, and Alex Harris, a senior associate at Gibson Dunn who graduated from law school in 2012; $375 for Patrick Hyden, a senior associate at Gibson Dunn who served as a mid-level associate during most of litigation and graduated from law school in 2014; $300, "slightly above market rate," for a first-year and junior associates at Gibson Dunn given the complex nature of the work. HomeAway.com, Inc. v. City of New York, No. 18 CIV. 7742, 2021 WL 791232, at *17-18 (S.D.N.Y. Mar. 1, 2021).  In March 2021, a court found that "$475 per hour – slightly higher than the rate applied in *Ekukpe*, to account for the inevitable upward drift of legal fees over time in this jurisdiction – is a fair figure for the work of an experienced and skillful civil rights attorney with a solo practice on this 'garden variety' § 1983 action that never came close to trial and was ultimately settled, pursuant to Rule 68, prior to the first court conference."  Robles v.

City of New York, No. 19CV6581, 2021 WL 1034773, at *9 (S.D.N.Y. Feb. 26, 2021), report and recommendation adopted, No. 19CIV6581, 2021 WL 1177462 (S.D.N.Y. Mar. 29, 2021).  In February 2021, in a case under the Americans with Disabilities Act, the court considered hourly rates in civil rights cases finding that $375 was reasonable for "an experienced litigator who has litigated many cases under the ADA in this District and has more than fifteen years' experience practicing law in New York."  Juscinska v. Meson Sevilla, Ltd., No. 19-CV-5284, 2021 WL 706548, at *2 (S.D.N.Y. Feb. 23, 2021).  In January 2021, a court determined that a $500 hourly rate was reasonable for Sang J. Sim, named partner at Sim & DePaola, LLP, based on his training and substantial experience and "because that is the 'rate he charges in civil rights matters'"; a $400 hourly rate was reasonable for Samuel DePaola, the other named partner at Sim & DePaola, LLP, because he is an attorney with "comparatively limited experience," practicing for nine years, including practicing civil rights cases for five years; and a $300 hourly rate was reasonable for Markus Wilson, a senior associate at the firm with eight years of experience litigating civil rights matters.  Field v. Metro. Transp. Auth., No. 20-CV-928, 2021 WL 22817, at *2-3 (S.D.N.Y. Jan. 4, 2021).

The Court has considered current  relevant caselaw, the parties' submissions on this motion and the nature of this action, which did not involve uncommon factual, procedural or legal complexity or novelty before or during the trial before the defendant asserted his qualified immunity defense, when Padilla performed most of his work on the case, and Padilla's involvement in the case after he enlisted Zelman's help and during the appellate phase consisted of communicating with Zelman, Ali and the plaintiff, reviewing briefs and caselaw and researching caselaw.  Upon consideration of all relevant factors, including Padilla's experience, skills and the quality of his performance, the nature and length of this case, the case-specific

variables, and the lack of caselaw supporting a $500 hourly rate for a civil rights attorney with comparable experience and skills to those of Padilla in similar circumstances, the Court finds that $450 is a reasonable hourly rate for Padilla.

Zelman

The defendant asserts that "Zelman has played a limited and largely invisible role," and his request for a $600 hourly rate is in the highest range in this district and higher than the $450 hourly rate that he was awarded in "Thomas v. City of N.Y., No. 1:09-cv-3162 (ALC), 2017 U.S. Dist. LEXIS 232964, at *5 (S.D.N.Y. Dec. 15, 2017) (awarding $450 an hour rather than the $500 sought by Mr. Zelman and reducing his 'unreasonable' claimed hours from 59 to 8.6)." The defendant asserts that a reduction from $600 to $350 is warranted, relying on the 2015 and 2020 cases from the Eastern District of New York in which a $350 hourly rate was found reasonable for Zelman. According to the defendant, nothing in Zelman's experience or the nature of work required in the post-trial motion phase warrants an exceptionally high hourly rate.

The defendant's unsupported assertion that Zelman played a "largely invisible role" is puzzling since Zelman entered his appearance in this action, signed the brief and argued the post-verdict opposition to the defendant's motion for judgment as a matter of law and represented the plaintiff at the appellate mediation directed by the Second Circuit in February 2019. As explained above, the defendant's reliance on cases from the Eastern District of New York is misplaced because that is not the applicable forum. In support of his request for a $600 hourly rate for Zelman, the plaintiff relies on the 2008 "single plaintiff sexual harassment and retaliation case, complicated by the computer 'hacking' issue and by the extent of conflict between opposing counsel" litigated in this forum in which the court found, based on the rates actually charged, counsel's experience, other rates charged in this forum and the complexity of the case,

that "a reasonable rate for partners and counsel (Ms. Peratis and Mr. Steel) is $600; for senior

associates (Mr. Humowiecki and Ms. Malalis), $350; for junior associates (Ms. Miazad and Ms.

Quinlan), $250; for law clerks, $175; and for paralegals, $125."  Rozell, 576 F. Supp. 2d at 546.

In his declaration Zelman stated that he has been practicing civil rights litigation for

approximately 20 years, worked on approximately 250 civil rights cases since 1999 and "tried

several civil rights matters."  Zelman did not indicate the customary rate he charges his clients or

his success rate in any of the several trials he conducted.  According to Zelman, when Padilla

asked for his assistance when the defendants raised the issue of qualified immunity "as well as an

interest . . . in submitting interrogatories to the jury," Zelman "performed some research and

provided it to Mr. Padilla and advised him as to what I felt were the best arguments for him to

make."  Thereafter, when Padilla asked Zelman to become involved formally, Zelman briefed

and argued the qualified immunity issue in Treubig's post-trial motion, after which he sought

actively appellate counsel to assist in the matter.  After Ali contacted Padilla about the case,

Zelman worked with Ali to ensure that "he had an accurate and complete understanding of the

proceedings below, including all of the documentation which was necessary for Mr. Ali to

review."  Zelman stated that he reviewed Ali's briefs and made comments and suggestions.  Ali

did not state in his declaration that Zelman reviewed his briefs and made comments and

suggestions.

Contrary to the defendant's assertion that nothing in Zelman's experience or the nature of

the work required in the post-trial motion phase warrants an exceptionally high hourly rate,

Zelman's approximately 20 years of experience and his work on approximately 250 civil rights

cases demonstrate that he is an experienced attorney, and the complexity and the nature of his

work in opposing the defendant's post-verdict motion on the issue of qualified immunity is best

demonstrated by the subsequent appeal, which was based on Zelman's arguments that "[t]he law regarding the use of tasers was clearly established at the time of this incident in the Second Circuit" and "defendant Treubig's claim of qualified immunity during the second use of the taser when the plaintiff was not resisting is unavailable." Docket Entry No. 98. Although Zelman's brief and argument in opposition to the defendant's motion for judgment as a matter of law did not persuade the trial judge who granted the defendant's motion, it served as the basis for a successful appeal. However, without information about the actual rate Zelman charges his clients and his previous success rate, and upon considering the record, the relevant factors, the unsuccessful opposition to the post-trial motion, and the circumstances of this case, the Court finds that the reasonable hourly rate for Zelman is $550.

Ali

The defendant asserts that Ali's requested rate of $525 should be reduced to $400, considering his less than one decade of experience, the appellate work he performed in this case, his organization's lack of "massive overhead costs that often justify extremely high rates for large firms," and that his becoming involved in the appeal of a qualified immunity issue "produced reputational benefits." The defendant made no citation to any evidence for his assertions concerning overhead costs of Ali's organization and the "reputational benefits" produced by Ali's involvement in this case. The defendant does not contest the quality of Ali's performance in this case and the only remaining basis for reducing Ali's hourly rate is that he has "less than a decade of experience." However, the length of experience is not the only or determining factor when assessing a reasonable hourly rate and, without more, cannot serve as the proper basis for reducing Ali's hourly rate considering all other factors and the specific circumstances of this case.

Ali explained in his declaration that the Roderick & Solange MacArthur Justice Center ("MJC") is a nonprofit public interest firm, which litigates important civil rights issues ranging from police misconduct, criminal procedure and sentencing, prison and jail conditions, solitary confinement, wrongful death and wrongful convictions, and habeas corpus" and " MJC's Supreme Court & Appellate Program consists of five full-time attorneys with specialized expertise in appellate and civil-rights litigation."  Ali litigated dozens of appeals on civil rights and criminal justice issues in federal appellate courts and he argued successfully two cases in the United States Supreme Court,  "*Welch v. United States*, 136 S. Ct. 1257 (2016)" and "*Garza v. Idaho*, 139 S. Ct. 738 (2019)."  In recent years, Ali has been retained by victims of police violence across the country to argue some of the most significant appeals concerning the doctrine of qualified immunity, including last year, when he

> was retained by shooting victim Ryan Cole and his family to argue before eighteen judges of the en banc Fifth Circuit, and obtained an 11-7 decision holding that Texas police officers violated clearly established law when they shot Ryan. See *Cole v. Carson,* 935 F.3d 444 (5th Cir. 2019) (*en banc*), cert. denied, *Hunter v. Cole*, No. 19-753, 2020 WL 3146695 (U.S. June 15, 2020). I was also retained by the estate and family of Marquez Smart on appeal to the Tenth Circuit, and obtained a unanimous decision reversing qualified immunity to the officer who shot and killed Mr. Smart in downtown Wichita, Kansas. *See Smart v. City of Wichita*, 951 F.3d 1161 (10th Cir. 2020).

Concerning Ali's involvement in this case, he stated:

> Following the grant of qualified immunity, MJC's Supreme Court & Appellate Program identified as one which raised issues of national importance and had potential grounds for appeal, but presented a significant risk of going without any appeal. This concern was driven by the fact that the case did not involve any compensatory damages and that the jury's award of $30,000.25 would provide insufficient financial incentive for an appeal of this complexity. . . .  In November 2018, I contacted Alexis Padilla and David Zelman to offer assistance on appeal to the U.S. Court of Appeals for the Second Circuit. Mr. Padilla and Mr. Zelman indicated to me that they were considering forgoing any appeal given the time required to litigate an appeal and the unlikelihood of overcoming qualified immunity on appeal. . . .  MJC agreed to represent Mr. Jones without any charge or

contingency fee, relying exclusively on the right to petition for fees in the event it
succeeded on appeal.

Ali described in detail the complexity of the appeal, which required a comprehensive review of

the testimony and evidence presented at trial and numerous letter and oral motions during and

following the trial, stating that of the many dozens of appeals he handled during his career, "the

issues briefed in this case were among the most complex and research-intensive," which

included: (a) "[t]he constitutional standards governing law enforcement use of force and

excessive force"; (b) "[t]he doctrine of qualified immunity"; (c) "[t]he U.S. Court of Appeals for

the Second Circuit's deep body of caselaw concerning the procedures for supplemental

interrogatories"; and (d) "[t]he constitutional standards surrounding the Seventh Amendment

right to a jury in a civil trial."  Ali explained that, consistent with the complexity and research-

intensive nature of the appeal, Ali filed a 55-page opening brief, which included in-depth

analysis of cases across all circuits, which was opposed by the defendant's 48-page brief raising

new, alternative reasoning "premised on a novel account of the witness testimony at trial" and

"dozens of cases that the City cited for the first time," all of which raised novel legal questions

and "serious consequences to this case and civil rights generally."  The novel and important

issues raised by the defendant's brief attracted the attention of a national think tank, The Cato

Institute, which filed a 27-page amicus brief in support of the plaintiff, who prevailed on appeal

when the Second Circuit issued its 57-page opinion.

Upon considering the record, Ali's experience and skills, the relevant factors, the

complexity of the appeal, and the circumstances of this case, the Court finds that the reasonable

hourly rate for Ali is $525.

Schmutzer and Ram

The defendant asserts that Schmutzer's hourly rate of $150 and Ram's hourly rate of $250 should be reduced to $125 because a law clerk should be awarded slightly more than a paralegal in a small firm context, relying on "Schoolcraft v. City of N.Y., 2016 U.S. Dist. LEXIS 183036, at *19 (S.D.N.Y. Sep. 1, 2016)."  However, the hourly rates awarded in 2016 are historical.  In March 2021, "[r]ates in this district for junior associates range from $200 to $350 per hour at law firms specializing in civil rights" and $150 was awarded as a reasonable hourly rate for a law clerk.  Sanson, 2021 WL 1191566, at *4 ("The hourly rate for the time Cullum and Jasinski billed as associates is reduced to $200 and the hourly rate for their time billed as law clerks is reduced to $150.").  Upon review of the record, Schmutzer's and Ram's experience and skills, the relevant factors, the complexity of the appeal, and the circumstances of this case, the Court finds that the reasonable hourly rate for Schmutzer is $150 and for Ram is $250.  See Sanson, 2021 WL 1191566, at *4.

**Reasonable Hours**

The defendant seeks a reduction of the hours as follows: 51 hours for Padilla (from 312 to 261), a 50% reduction for Zelman's 53.5 hours expended on the post-trial motion and all hours claimed related to the appeal should be rejected (from 104.5 to 26.75), a 40% reduction for Ali's hours (from 302.2 to 181.2), and a 40% reduction for Ram's 27 and Schmutzer's 36.1 hours (from 63.1 to 37.86).  The reduction is requested for: (1) Padilla based on ".3 hours mailing initial disclosures on February 21, 2017; 2 hours drafting the Amended Complaint on May 25, 2017," "7.5 hours on proposed voir dire questions," and hours expended from May 24, 2018, onward consisting mostly of communications with Zelman; (2) Zelman because the hours expended opposing the post-trial motion are unreasonable and no reasonable client would agree

36

to compensate Zelman "to simply stay apprised of the issues being addressed on appeal"; and (3) Ali, Schmutzer and Ram because their hours "exceed the level recognized as reasonable" in "Ortiz v. City of N.Y., No. 15-CV-2206 (DLC), 2020 U.S. Dist. LEXIS 26241, at *18 (S.D.N.Y. Feb. 14, 2020)." The plaintiff asserts that the defendant's challenge to: (a) Padilla's 20.7 hours is superficial and only 9.9 hours were expended on his communication with Zelman, with the remaining hours devoted to communications with the plaintiff, a telephonic hearing, research and review of briefs and court decisions; (b) Zelman's hours is not supported by legal authorities; and (c) Ali's hours fails to identify any hours in his time records as unreasonable.

Padilla

The defendant's assertion that Padilla's hours expended on drafting the amended complaint replacing Doe defendants with named defendants and omitting certain allegations and voir dire questions are excessive, without citation to any authority in support, are rejected as baseless. The defendant's challenge to Padilla's hours expended communicating with Zelman in connection with the post-trial motion and hours expended in connection with the appellate phase, as lacking specificity and being duplicative is meritless. Padilla did not state in his declaration that he performed substantive work once Zelman entered his formal appearance or during the appellate phase and his time records reflect that. The defendant does not make citation to any binding authority for the proposition that it was unreasonable to communicate with Zelman and Ali in connection with the post-trial motion and appeal and to review related briefs, which is what Padilla's time records demonstrate. Since only one attorney performed substantive work on each phase of the case, namely, Padilla, Zelman and Ali, with Schmutzer and Ram assisting Ali with legal and factual research, the Court does not find that Padilla's time entries showing communications with Zelman and Ali lack specificity or that they are duplicative or unnecessary.

Similarly, the Court does not find that the limited hours Padilla expended reviewing briefs in connection with the post-trial motion and appeal are duplicative, unnecessary or unreasonable under the circumstances of this case.  Given that the defendant's qualified immunity defense was the only issue on the post-trial motion handled by Zelman and on the appeal handled by Ali, the Court does not find that Padilla's communication time entries lacked specificity under the circumstances of this case.  Upon review of the parties' submissions, including Padilla's time records, and the relevant factors, the Court finds that Padilla's 351.9 hours (312 hours prior to the fee application plus 39.9 hours in connection with the fee application) are reasonable.

Zelman

The defendant asserts that Zelman's request for 53.5 hours related to the post-trial motion "is unreasonable on its face" and should be reduced 50%, without citation to any authority.  The defendant's unsupported, self-serving, conclusory assertion is meritless.  The defendant also asserts that Zelman's request for the hours related to the appeal should be denied because no reasonable client would be willing to pay Zelman "to simply stay apprised of the issues being addressed on appeal," relying on Thomas v. City of N.Y., No. 1:09-cv-3162 (ALC), 2017 U.S. Dist. LEXIS 232964, at *4 (S.D.N.Y. Dec. 15, 2017) (reducing Mr. Zelman's claimed hours from 59 to 8.6 because 'under the facts of this case, no client would be willing to pay trial counsel for 59 hours of work on an appeal, when appellate counsel was retained to work on the appeal.')." The defendant concedes that the court did not deny Zelman's hours expended in connection with the appeal in that case; rather it reduced them.  See Thomas v. City of New York, No. 1:09-CV-3162 (ALC), 2017 WL 11563332, at *2 (S.D.N.Y. Dec. 18, 2017) ("However, the Court does find that Mr. Zelman is entitled to attorney's fees for work done during the appeal, but that the calculation should be based upon Ms. Hasapidis' fee schedule. . . .

The amount of work includes any *substantive* correspondence between Mr. Zelman and Ms. Hasapidis, any review of the trial record to assist Ms. Hasapidis with the preparation of appendix, brief, and oral argument, and preparation of the fee application."). Thus, <u>Thomas</u> does not support the defendant's request to deny all hours Zelman expended in connection with the appeal.

However, the Court finds that 51 hours related to the appeal are excessive. For example, no reasonable client would be willing to pay 4.5 hours for Zelman to attend oral argument on the appeal which was briefed and argued by the appellate attorney, Ali, 4 hours to read the Second Circuit decision in favor of the plaintiff and reviewing filings on appeal, including orders, notices, court entries and amicus briefs for no apparent reason other than to be appraised of the progress on appeal. Although Ali's time records contain numerous entries indicating "conferred," they do not identify the persons with whom Ali conferred and Zelman is not mentioned in Ali's time records; thus, unlike in <u>Thomas</u>, the Court cannot calculate Zelman's hours based on Ali's time records.

Zelman's time entries include hours billed in connection with "Camp conference," without any explanation in the time entries or his declaration of the meaning of that phrase. Although Ali stated in his declaration that Zelman represented the plaintiff at the February 28, 2019 appellate telephonic mediation, Zelman did not state in his declaration that he represented the plaintiff at the appellate mediation and his time records do not mention the word "mediation." Exhibit D, "the City's email exchange with the mediator," to Ali's declaration indicates that the defendant's counsel sent an email, on "January 25, 2019 11:16AM," to various recipients including "Camp Support," Zelman and Ali, and "CA02db CampSupport" sent an email on "January 25, 2019 4:33PM," to various recipients including Zelman and Ali providing

dates to reschedule "[t]he CAMP conference," and signing the email on behalf of the "CAMP

Support Civil Appeals Mediation Program (CAMP)."  Zelman's silence on his representation of

the plaintiff during the appellate mediation and the lack of any explanation of the term "Camp

conference" in his time records constitute a material deficiency in Zelman's submissions in

support of his fee request.  Had it not been for Ali's declaration and Exhibit D attached to Ali's

declaration explaining the meaning of "CAMP conference" and demonstrating that Zelman was

included in the email correspondence, with "CAMP Support," the Court would not know that

Zelman represented the plaintiff at the appellate mediation and the nature of Zelman's hours

billed in connection with the "Camp conference."

The Court finds that reducing Zelman's 51 hours related to the appeal by 50% is

warranted, based on the excessive hours including those which no reasonable client would be

willing to pay and the performance of unnecessary tasks that duplicated Ali's tasks that he was

required to perform as the appellate attorney of record, resulting in 25.5 hours.  See  Fox, 563

U.S. at 838, 131 S. Ct. at 2216 ("But trial courts need not, and indeed should not, become green-

eyeshade accountants.  The essential goal in shifting fees (to either party) is to do rough justice,

not to achieve auditing perfection.  So trial courts may take into account their overall sense of a

suit, and may use estimates in calculating and allocating an attorney's time.").  Upon review of

the time records, the relevant factors and the circumstances of this case, the Court finds that 94

hours are reasonable for Zelman (53.5 hours related to the post-trial motion, 25.5 hours related to

appeal and 15 hours related to the instant fee application).

Ali

The defendant asserts that the 302.2 hours Ali expended "exceed the level recognized as

reasonable," namely 280 hours conservatively and 340 hours generously, relying on

Ortiz v. City of New York, No. 15CV2206(DLC), 2020 WL 755878, at *7 (S.D.N.Y. Feb. 14,

2020), aff'd in part, rev'd in part and remanded, 843 F. App'x 355 (2d Cir. 2021) ("A single

lawyer would have spent conservatively about 280 hours on this litigation, and generously about

340 hours.").  The court in Ortiz explained:

> The two lead counsel, Lee and Benno, assert that they worked 734 and 771.30
> hours, respectively, on this case. That is equivalent to almost 38 weeks of work
> (measured in 40-hour work weeks), or over four months of attorney time devoted
> to claims that prompted three depositions and were tried in the course of one week.
> This represents an extraordinary misallocation of resources. Nothing in this case
> supports these numbers. A single lawyer would have spent conservatively about
> 280 hours on this litigation, and generously about 340 hours. This calculation takes
> into account, among other things, the hours that were necessary to do each of the
> following: (1) pretrial work, including the notice of claim practice, drafting the
> complaint and preparing for and attending the initial pretrial conference, (2) taking
> or defending three depositions, (3) summary judgment practice, (4) briefing on
> motions in limine and trial preparation, (5) trial, (6) the post-trial motion, and (7)
> appeal.  This amount of time would be adequate given the lack of novelty and
> complexity of this run-of-the-mill § 1983 action.

> Ortiz , 2020 WL 755878, at *6-7.

However, this case did not involve "the lack of novelty and complexity" of the "run-of-the-mill §

1983 action" present in Ortiz, and the defendant acknowledged as much when he asserted that

"Ali necessarily spent a substantial amount of time crafting his appellate arguments and

successfully advocating for his position" on the qualified immunity, which "is a developing legal

issue."  The defendant does not make citation to any binding authority in support of his argument

that 302.2 hours is excessive in the circumstance of this case, and by his own cited authority,

Ortiz, Ali's 302.2 hours are within the range of reasonable hours.  The defendant does not assert

that Ali's time entries are vague or deficient.  Moreover, the defendant does not provide citation

to any authority justifying his request for a 40% reduction of Ali's hours or explain why 40%

and not some other percentage is appropriate in this circumstance.  Upon review of the record,

the relevant factors and the circumstances of this case, the Court finds that 323.1 hours are reasonable for Ali (302.2 related to appeal and 20.9 related to the fee application).

<u>Schmutzer and Ram</u>

The defendant asserts that Schmutzer's 36.1 hours and Ram's 27 hours are unreasonable and should be reduced by 40% for the same reasons urged for reducing Ali's hours. The Court finds that Schmutzer's 36.1 hours and Ram's 27 hours are reasonable for the same reasons as the hours expended by Ali.

***Reasonable Costs***

The defendant concedes that the categories of expenditures for which the plaintiff seeks costs are appropriate but asserts that a reduction of 30% is appropriate based on the plaintiff's limited success, relying on "<u>Anderson v. City of N.Y.</u>, 132 F. Supp. 2d 239, 247 (S.D.N.Y. 2001) (applying a 40% across the board reduction to plaintiff's claimed costs for computerized research)." The defendant's reliance on <u>Anderson</u> is misplaced because the plaintiff does not seek costs for computerized research. The defendant does not assert that any costs are excessive or unreasonable. The Court finds that $2,562.45 in costs incurred by Padilla and $1,425.59 in costs incurred by Ali are reasonable.

**CONCLUSION**

For the foregoing reasons, the plaintiff's motion for attorney's fees and costs pursuant to 42 U.S.C. § 1988, Docket Entry No. 141, is granted and the following attorney's fees and costs are found to be reasonable:

| | Rate | Hours | Attorney's Fees | Costs | Total |
|---|---|---|---|---|---|
| Alexis G. Padilla | $450 | 351.9 | $158,355 | $2,562.45 | $160,917.45 |
| David Zelman | $550 | 94 | $51,700 | | $51,700 |
| Amir H. Ali | $525 | 323.1 | $169,627.5 | $1,425.59 | $171,053.09 |
| David Schmutzer | $150 | 36.1 | $5,415 | | $5,415 |
| Meghan Ram | $250 | 27 | $6,750 | | $6,750 |
| TOTAL | | | | | $395,835.54 |

Dated: New York, New York
     August 24, 2021                SO ORDERED:

                                       *Kevin Nathaniel Fox*
                              KEVIN NATHANIEL FOX
                              UNITED STATES MAGISTRATE JUDGE